UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x

CHRISTIAN STOKES,                                              :

                        Plaintiff,            :            08 Civ. 3667 (CM) (DFE)

                                    :

  - against -                                                    :

                                    :            **AFFIDAVIT IN SUPPORT**

RONALD LUSKER, MARILYN KOCHER LUSKER,    :            **OF MOTION TO DISMISS**

EBERT & ASSOCIATES, STEVEN EBERT, ESQ.,       :            **THE COMPLAINT AS TO**

ERIC MALLEY, 85-87 MERCER STREET                  :            **DEFENDANTS RONALD**

ASSOCIATES, INC.,                                                :            **LUSKER AND MARILYN**

                                  :            **KOCHER LUSKER**

                 Defendants.              :

--------------------------------------------------------------------- x

STATE OF NEW YORK    )
                          ) ss.
COUNTY OF NEW YORK  )

      BARRY M. KARSON, being duly sworn, deposes and says:

      1.     I am an attorney duly admitted to practice before the courts of the State of New York and before this Court, and I am a member of Karson & Long, LLP, attorneys for defendants Ronald Lusker and Marilyn Kocher Lusker (together, the "Luskers") in the captioned case. I submit this affidavit in support of the Luskers' motion to dismiss the claims for fraud and conspiracy it appears plaintiff Christian Stokes ("Stokes") attempts to allege as against them in the first cause of action in the complaint in this case, and to dismiss the claims for unjust enrichment, fraudulent inducement and violation against the "policy of penalties and/or forfeiture" contained in the second cause of action of the complaint which appear to be lodged against them. Therefore, I place before the Court copies of documents relevant to the resolution of that motion.

      2.     Attached to this affidavit are copies of the following documents:

| Exhibit | Document |
|---------|----------|
| 1 | Complaint dated April 14, 2008 filed by Stokes in this case; and |
| 2 | Contract of Sale – Cooperative Apartment March 30, 2007. |

3.    For the reasons set forth in the accompanying Memorandum of Law of Defendants Ronald Lusker and Marilyn Kocher Lusker in Support of Their Motion to Dismiss, dated June 19, 2008, I respectfully request that the Court grant the Luskers' motion to dismiss in all respects.

Barry M. Karson

Sworn to before me this
_19th_ day of June, 2008

Notary Public

DAVID G. TOBIAS
Notary Public, State of New York
No. 02TO4741211
Qualified in New York County
Commission Expires August 6, 2009

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

CHRISTIAN STOKES,                                           :

                                    Plaintiff,              :        08 Civ. 3667 (CM) (DEF)

                                                           :

    - against -                                            :

                                                           :        **AFFIDAVIT OF SERVICE**

RONALD LUSKER, MARILYN KOCHER LUSKER, EBERT       :
& ASSOCIATES, STEVEN EBERT, ESQ., ANDREWS         :
BUILDING CORP., MALLEY GROUP, ERIC MALLEY,         :
85-87 MERCER STREET ASSOCIATES, INC.,              :

                                                           :
                                    Defendants.             :

------------------------------------------------------------------------ x

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )

ELAINE MILLER, being duly sworn, deposes and says:

1.     I am not a party to the action, am over 18 years of age and reside in Dumont, New Jersey 07628.

2.     On June 24, 2008, I served a true copy of a Notice Of Motion To Dismiss The Complaint As To Defendants Ronald Lusker And Marilyn Kocher Lusker and Affidavit in Support, dated June 19, 2008, in the above referenced matter, by regular mail in a pre-paid wrapper at a depository under the exclusive care and custody of the United States Post Office within New York State, addressed to Joseph H. Neiman, Esq., Attorney for Plaintiff, at 179-36 80th Road, Jamaica Estate, New York 11432.

                                                              _____
                                                                      ELAINE MILLER

Sworn to before me this
____ day of June, 2008

_____
Notary Public

DAVID G. TOBIAS
Notary Public, State of New York
No. 02TO4741211
Qualified in New York County
Commission Expires August 6, 2009

Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'08 CIV 3667**

---

CHRISTIAN STOKES,

        Plaintiff,

  vs.

RONALD LUSKER, MARILYN KOCHER LUSKER,
EBBERT & ASSOCIATES, STEVEN EBBERT, ESQ.,
ANDREWS BUILDING CORP., MALLEY GROUP,
ERIC MALLEY, 85-87 MERCER STREET
ASSOCIATES, INC.,

        Defendants.

CIVIL ACTION NO.

**COMPLAINT AND
JURY DEMAND**



---

Plaintiff, Christian Stokes, by and through his attorney Joseph H. Neiman,

complaining of the Defendants, alleges the following upon information and belief:

### NATURE OF THE CASE

1.     This is an action brought by Christian Stokes against various parties

alleging breach of contract with regard to a real estate transaction.  In addition, Plaintiff

alleges claims for negligence, fraud, and professional mal-practice.  By this action,

Plaintiff seeks money damages for breach of contract, negligence, fraud with inducement,

fraud and professional mal-practice, liquidated, compensatory and punitive damages and

attorney's fees.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. Sec. 1332:a:2. The action is between citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of interest and costs.

3.      Venue is proper in this district pursuant to 28 U.S.C. Sec. 1391, as the acts complained of herein took place in City of New York, State of New York and all defendant's reside or do business in the City of New York, State of New York.

## PARTIES

4.      Plaintiff, Christian Stokes, is an individual of legal age, residing at 11 Marino Park, Mount Merrion Avenue, Blackrock, Dublin, Ireland.

5.      Defendant, Ronald Lusker, is an individual of legal age, residing at 85-87 Mercer Street, New York, New York 10012 and the Seller of the Co-op located at 85-87 Mercer Street, New York, New York.

6.      Defendant, Marilyn Kocher Lusker, is an individual of legal age, residing at 85-87 Mercer Street, New York, New York 10012 and the Seller of the Coop located at 85-87 Mercer Street, New York, New York.

7.      Defendant, Ebert & Associates is the law firm that represented plaintiff in the purchase of the Coop located at 85-87 Mercer Street, New York, New York.

8.      Defendant, Steven Ebert, Esq. is the attorney that represented plaintiff in the purchase of the Coop located at 85-87 Mercer Street, New York, New York.

9.      Defendant, Andrews Building Corp. is the Managing Agent of the Coop located at 85-87 Mercer Street, New York, New York.

10.    Defendant, Malley Group is the real estate broker who represented plaintiff in the purchase of the Coop located at 85-87 Mercer Street, New York, New York.

11.    Defendant, Eric Malley is the real estate broker who represented plaintiff in the purchase of the Coop located at 85-87 Mercer Street, New York, New York.

12.    Defendant, 85-87 Mercer Street Associates, Inc., is the cooperative housing corporation.

### AS AND FOR A FIRST CAUSE OF ACTION

13.    Plaintiff, repeats and realleges each and every allegation contained in the Paragraphs 1 through 12 of this Complaint as though each were fully set forth at length herein.

14.    Plaintiff was intending to invest certain sums of money in real estate in the City of New York, State of New York.

15.    Plaintiff contacted defendant Eric Malley of the Malley Group.

16.    In or about March of 2007, Plaintiff was shown a certain coop unit located at 85-87 Mercer Street, New York, New York by Eric Malley of Malley Group.

17.    During those showings, Eric Malley of Malley Group advised plaintiff that this would be a perfect place for a commercial retailer and that the return on the rental that he could obtain for plaintiff would be 1.1 to 1.2 million dollars which would more than cover the mortgage that plaintiff would need to purchase the premises.

18.    At all times the defendant Eric Malley represented to plaintiff that the premises would be more than suitable for such occupancy.

19.    Plaintiff then solicited Steven Ebert, Esq. Of Ebert & Associates to represent him in the matter in the purchase of the premises to protect his legal interest and advise him on the purchase of said premises.

20.    At all times, defendants, Erick Malley and Steven Ebert, Esq. knew that the only way plaintiff could financially perform the terms of the agreement was to be able to rent said premises to a commercial retailer.

21.    Unbeknownst to plaintiff at all times, the premises could not be rented to a commercial tenant because of restrictions within both the Coop By-Laws and Deed.

22.    At all times, the Sellers, Ronald Lusker and Marilyn Kocher Lusker knew that plaintiff wanted to rent said premises to a commercial retailer but, not only did they not advise plaintiff but conspired with 85-87 Mercer Street Associates, Inc. and Andrews Building Corp. in order to wrongfully obtain the deposit money plaintiff made in respect to such agreement.

23.    The coop board, 85-87 Mercer Street Associates, Inc. approved the plaintiff to purchase the unit despite the fact that it knew that plaintiff could not financially undertake the transaction. It did this in connection with Ronald Lusker and Marilyn Kocher Lusker to allow the Sellers to fraudulently and unjustly retain plaintiff's deposit of $250,000.00.

## AS AND FOR A SECOND CAUSE OF ACTION

24.    Plaintiff, Christian Stokes, repeats and realleges each and every allegation contained in the Paragraphs 1 through 23 of this Complaint as though each were fully set forth at length herein.

4

25.    Defendants, Ronald Lusker and Marilyn Kocher Lusker are obligated to return the deposit of $250,000.00 under the following legal theories; unjust enrichment, fraudulent inducement and violation against the policy of penalties and/or forfeiture.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS, 85-87 MERCER STREET ASSOCIATES, INC. and ANDREWS BUILDING CORP.

26.    Plaintiff, Christian Stokes, repeats and realleges each and every allegation contained in the Paragraphs 1 through 25 of this Complaint are realized and incorporated herein by reference as though fully set forth at length herein.

27.    At all times, the coop agent, Andrews Building Corp., knew plaintiff could only financially complete the transaction if plaintiff could put in a commercial retailer.

28.    Defendants are obligated to return the monies to plaintiff as they either negligently approved the purchase or upon information and belief did so in conspiracy with defendants, Ronald Lusker and Marilyn Kocher Lusker because at all times 85-87 Mercer Street Associates, Inc. and Andrews Building Corp. were aware that the plaintiff would not and could not apply financially with the terms of the contract.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS, MALLEY GROUP and ERIC MALLEY

29.    Plaintiff, Christian Stokes, repeats and realleges each and every allegation contained in the Paragraphs 1 through 28 of this Complaint are realized and incorporated herein by reference as though fully set forth at length herein.

30.    Eric Malley either intentionally or negligently misrepresented to plaintiff his ability to obtain commercial tenants and knew or should have known that the plaintiff

would not be able to obtain such tenants and therefore could not financially comply with the terms of the deal and would eventually lose his deposit of $250,000.00.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST DEFENDANTS, EBERT & ASSOCIATES
## and STEVEN EBERT, ESQ.

31.    Plaintiff, Christian Stokes, repeats and realleges each and every allegation contained in the Paragraphs 1 through 30 of this Complaint are realized and incorporated herein by reference as though fully set forth at length herein.

32.    Defendant, Steven Ebert, Esq. was hired to represent plaintiff.

33.    Defendant, Steven Ebert, Esq. failed in his obligation to represent plaintiff and failed to read the documents which would have enlightened the plaintiff and avoided this transaction and furthermore, had plaintiff sign the contract without either obtaining or reviewing all of the necessary documents from the coop board and the sellers.

34.    Additionally, Defendant, Steven Ebert, Esq. failed to provide in plaintiff's contract that plaintiff would be free to rent to a commercial tenant.

WHEREFORE, Plaintiff respectfully prays this court enter judgment on all Counts for compensatory damages in the sum of $250,000.00, punitive damages to be determined by the trier of fact, attorney's fees to be determined by the court, as well as interest and costs incurred in this action and for such other further relief as this court deems just and proper.

Dated: April 14, 2008

Joseph H. Neiman, Esq.
Attorney for Plaintiff
179-36 80th Road
Jamaica Estate, New York 11432
(201) 487-0061

**JURY DEMAND**

Plaintiff demands trial by jury with respect to all issues so triable.

Dated: April 14, 2008

Joseph H. Neiman, Esq.
Attorney for Plaintiff
179-36 80th Road
Jamaica Estate, New York 11432
(201) 487-0061

Exhibit 2

123-Contract of sale cooperative apartment, 7-0)
Prepared by The Committee on Condominiums and Cooperatives of the Real Property Section of the New York State Bar Association

Blumberg Excelsior Inc., Publisher NYC 10
www.blumberg.c

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale – Cooperative Apartment

This Contract is made as of    March 30 ,2007        between the "Seller" and the "Purchaser" identified belo

**1 Certain Definitions and Information**
1.1 The "Parties" are:  RONALD "????"
**1.1.1 "Seller":**

RONALD LUSKER
MARILYN KUCHER LUSKER
*Prior names used by Seller:*
*Address:*     85-87 Mercer Street
New York, New York 10012

S.S. No. :
**1.1.2 "Purchaser":**

CHRISTIAN STOKES

*Address:*     255 Hudson Street, Apt. 4A
New York, New York 10013

S.S. No.:
1.2 The "Attorneys" are *(name, address and telephone, fax)*:
1.2.1 "Seller's Attorney"
Paul F. Peragine, Esq.
757 Third Avenue, 19th Floor
New York, New York 10017
(212) 973-9100 x 2227 (212) 973-9101 (fax)

1.2.2 "Purchaser's Attorney"
Steven Ebert, Esq.
Ebert & Associates
350 Fifth Avenue, Suite 4011
New York, New York 10118
(212) 290-4000 (212) 290-1717 (Fax)
1.3 The "Escrowee" is the [Seller's] [Purchaser's] Attorney.

1.4 The Managing Agent is *(name, address and telephone, fax)*:
Andrews Building Corp.
666 Broadway
New York, New York 10012
(212) 529-5688 / (212) 529-7987 (fax)
1.5 The real estate "Broker(s)" (see ¶12) is/are:

Company Name:   Malley Group

1.6 The name of the cooperative housing corporation
("Corporation") is:

85-87 Mercer Street Associates, Inc.

1.7 The "Unit" number is: IR including North Gallery
and westerly 2/3 of Cellar

1.8 The Unit is located in "Premises" known as:
85-87 Mercer Street

1.9 The "Shares" are the        15            shares of t
Corporation allocated to the Unit.

1.10 The "Lease" is the Corporation's proprietary lease or occupa-
cy agreement for the Unit, given by the Corporation which expi-
on —

1.11 "Personalty" is the following personal property, to the ext
existing in the Unit on the date hereof: the refrigerators, freeze
ranges, ovens, built-in microwave ovens, dishwashers, garbage d
posal units, cabinets and counters, lighting fixtures, chandelie
wall-to-wall carpeting, plumbing and heating fixtures, central a
conditioning and/or window or sleeve units, washing machines, d
ers, screens and storm windows, window treatments, switch plat
door hardware, mirrors, built-ins not excluded in ¶ 1.12 and

1.12 Specifically excluded from this sale is all personal property n
included in ¶ 1.11 and:  All kitchen appliances, kitchen
shelving, kitchen island and cabinetry, all closet doors, all
mirrors, and the upstairs bathroom sink and Jacuzzi.

1.13 The sale [does] [does not] include Seller's interest in
[Storage][Servant's Room][Parking Space] ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Leas
1.15 The date scheduled for Closing is   SEE RIDER
("Scheduled Closing Date") at       .M (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $14,000,000.00
1.16.1 The "Contract Deposit" is: $250,000.00
1.16.2 The "Balance" of the Purchase Price due at Closing is
$13,000,000.00   (See ¶ 2.2.2)  SEE RIDER
1.17 The monthly "Maintenance" charge is
$ 2,956.20    (See ¶4)
1.18 The "Assessment", if any, payable to the Corporation, at t
date of this Contract is $   NONE            , payable as follo

1.19 [Seller] [Purchaser] shall pay the Corporation's flip tax, tra
fer fee (apart from the transfer agent fee) and/or waiver of option:
("Flip Tax"), if any.
1.20. Financing Options *(Delete two of the following ¶¶ 1.20
1.20.2 or 1.20.3)*
1.20.1 Purchaser may apply for financing in connection with
sale and Purchaser's obligation to purchase under this Contract
contingent upon issuance of a Loan Commitment Letter by the Lo
Commitment Date (¶ 18.1.2).
1.20.2 Purchaser may apply for financing in connection with t
sale but Purchaser's obligation to purchase under this Contract is
contingent upon issuance of a Loan Commitment Letter.
1.20.3 Purchaser shall not apply for financing in connection
with this sale.
1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 a
a loan of $           for a term of        year

~~Purchaser and the "Loan Commitment Date" for ¶ 18 is ___ cal-endar days after the Delivery Date.~~

1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.

~~1.23 All "Proposed Occupants" of the Unit are:~~

1.23.1 persons and relationship to Purchaser:

~~1.23.2 pets:~~

~~1.24 The Contract Deposit shall be held in [a non-] [an] IOLA escrow account. If the account is a non-IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at~~

Depository:

Address:

~~(See ¶ 29.)~~

1.25 This Contract is [not] continued on attached rider(s).

# 2 Agreement to Sell and Purchase; Purchase Price; Escrow

2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale, for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:

2.2.1 the Contract Deposit at the time of signing this Contract, by Purchaser's good check ~~to the order of Escrowee~~ and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

# 3 Personalty

3.1 Subject to any rights of the Corporation or any holder of a mortgage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

# 4 Representations and Covenants

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller will make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶ 10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17 and 1.18;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable

law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

~~4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23;~~

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;

~~4.2.3 if ¶ 1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase;~~

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

# 5 Corporate Documents

Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).

# 6 Required Approval and References

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. ~~In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.~~

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶ 13.1 shall govern.

**7 Condition of Unit and Personality; Possession**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personality, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personality and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, ~~the appliances shall be in working order and~~ required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personality and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

**8 Risk of Loss**

8.1 The provisions of General Obligations Law Section 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personality.

8.2 Destruction shall be deemed "material" under GOL 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if, without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

**9 Closing Location**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

**10 Closing**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personality and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶ 2.22;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personality and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

**11 Closing Fees, Taxes and Apportionments**

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax").

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and any other periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified, or attorney's escrow check. This ¶ 11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶ 11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate

agreement. The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶ 12 shall survive Closing, cancellation or termination of this Contract.

## 13 Defaults, Remedies and Indemnities

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4, Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default may entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

## 14 Entire Agreement; Modification

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement.

14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be changed.

## 15 Removal of Liens and Judgments

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶ 4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

## 16 Seller's Inability

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchaser's lien and title search, if any.

## 17 Notices and Contract Delivery

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand, overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶ 17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

17.3.1 on the day delivered by hand;

17.3.2 on the business day following the date sent by overnight delivery;

17.3.3 on the 5th business day following the date sent by certified or registered mail; or

17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

## 18 Financing Provisions

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ 1.20.1 or 1.20.2 applies.

18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

18.2.1 apply only to an Institutional Lender for a loan on

the Financing Terms (see ¶ 1.21) on the term required by the Institutional Lender containing truthful and complete information, and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document/ financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶/18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18/3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶ 18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶ 12. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reim-

burse Purchaser for any non-refundable financing and inspection expenses and other sums reimbursable pursuant to ¶ 16.

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

## 19 Singular/Plural and Joint/Several

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

## 20 No Survival

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

## 21 Inspections

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

## 22 Governing Law and Venue

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

## 23 No Assignment by Purchaser; Death of Purchaser

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in Par. 12.

## 24 Cooperation of Parties

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

## 25 FIRPTA

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to Purchaser at Closing a Certification of Non-Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

## 26 Additional Requirements

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending in rem action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party may cancel this Contract (pursuant to ¶ 16.3) by Notice

## 27 Escrow Terms

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract.  At Closing, the Contract Deposit shall be paid by Escrowee to Seller.  If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction.  However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute, Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys selected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract.

## 28 Margin Headings
The margin headings do not constitute part of the text of this Contract.

## 29 Miscellaneous
This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶17.2 and 17.3. This Contract shall bind and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

## 30 Lead Paint
If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and or Lead-Based Paint Hazards is attached hereto and made a part hereof.

**In Witness Whereof,** the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:

SELLER:

PURCHASER:

_____                _____              _____
ESCROWEE                          RONALD LUSKER                  CHRISTIAN STOKES

                                 _____
                                 MARILYN KOCHER LUSKER

## Rider to, and Part of, Contract of Sale Between _____ as Seller and _____ as Purchaser for Unit ____ at ____

Suggested Purchaser's representations for use when applicable.

**31 Purchaser's Additional Representations and Covenants**
31.1 Supplementing ¶ 4.2 of the Contract, Purchaser also represents and covenants that:

31.1.1 Purchaser has, and will at Closing have, available unencumbered cash and cash equivalents (including publicly traded securities) in a sum at least equal to (and having a then current value of) the Balance; and

31.1.2 Purchaser has, and will at and immediately following the Closing have, a positive net worth.

31.2 The Maintenance and the monthly amount of the Assessment (if any) do not aggregate more than 25% of the current total gross monthly income of the individuals comprising the Purchaser;

31.3 (if ¶ 1.20.1 or ¶ 1.20.2 applies) the monthly debt service (interest and amortization of principal, if any) of the proposed financing, together with the Maintenance and the monthly Assessment amount (if any), do not aggregate more than 35% of said current total gross monthly income.

32 Supplementing paragraph 4.1, Seller has no actual knowledge of a material default or condition which the Lessee is required to cure under the Lease and which remains uncured. If, prior to Closing, Seller acquires knowledge of a such default or condition which the Lessee would be required to cure, then Seller shall cure same at or prior to Closing. This provision shall not survive closing.

The Parties have duly executed this Rider as of the same date as the Contract.

SELLER:                                  PURCHASER:

_____                        _____
RONALD LUSKER                            CHRISTIAN STOKES

_____
MARILYN KOCHER LUSKER

## Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure (initial)**

(a)  Presence of lead-based paint and/or lead-based paint hazards (check one below):

☐  Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

☒  Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)  Records and reports available to the seller (check one below):

☐  Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

☒  Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment (initial)**

*C.S*  (c)  Purchaser has received copies of all information listed above.
*C.S*  (d)  Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*.
*C.S*  (e)  Purchaser has (check one below):

☐  Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

☒  Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment (initial)**

_____  (f)  Agent has informed the seller of the seller's obligations under 42 U.S.C. 4582(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| | | | |
|---|---|---|---|
| Seller  RONALD LUSKER | Date | Seller  MARILYN KOGHER LUSKER | Date |
| Agent | Date | Agent | Date  3/27/07 |
| Purchaser | Date | Purchaser  CHRISTIAN STOKES | Date |

### RIDER TO CONTRACT OF SALE
#### Between
#### RONALD LUSKER and MARILYN KOCHER LUSKER, COLLECTIVELY, SELLER

#### and

#### CHRISTIAN STOKES
#### as PURCHASER

32    In the event of any inconsistency between the provisions of this Rider and those contained in the Contract of Sale to which this Rider is annexed, the provisions of this Rider shall govern.

33    Supplementing and modifying Paragraph 4, it is agreed as follows:

  A.    A pledge of the Shares and Lease by Seller in connection with any financing obtained by Seller shall not be deemed a misrepresentation or breach under Paragraph 4, provided that at closing such pledge shall have been terminated and the Shares and Lease are transferred free of any such security interests.

  B.    The Shares and Lease are subject to a general lien for unpaid maintenance charges in favor of the Corporation to secure payment of Seller's obligations under the Lease; however, no charges will be owed to the Corporation under such lien at closing.

34.    Supplementing Paragraph 6, Purchaser represents and warrants that he has no knowledge of any matter relating to his character that would constitute a reasonable ground for failure to receive approval from the directors, stockholders or managing or selling agent of the Corporation, and particularly that he has not filed a bankruptcy or insolvency proceeding or been convicted of a felony.

35.    Supplementing and modifying Paragraph 7, it is agreed that:

  A.    Seller is not obligated to install any equipment or appliances in the unit or otherwise make any improvement or decoration to the Unit or its equipment, appliances and, fixtures, except that the appliances shall be in working order at Closing.

  B.    Purchaser acknowledges having entered into this Contract without relying upon any promises, statements, representations, warranties, conditions or other inducements, express or implied, oral or written, not set forth herein.

36.   Supplementing and modifying Paragraph 11, a letter from the Corporation or its managing agent as to the status of the maintenance and assessments shall be sufficient for determining the apportionments.

37.   The acceptance of the Shares and the assumption of the Lease by Purchaser shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Contract except those which specifically survive Closing.

38.   This Contract shall be interpreted without the aid of any presumption against the party drafting or causing the drafting of the provision in question.

39.   Any notice or communication required or desired to be given hereunder shall be valid only if in writing, sent by certified mail or by overnight courier or e-mail and addressed to the respective parties with a copy sent, by like mail, to their respective attorneys, or to such other address or addresses as the parties hereto may hereafter designate by notice given in the manner provided for herein. If any such notice is mailed, the date of mailing in a United States Branch Post Office shall be deemed the effective dated thereof. If any such notice is delivered by overnight courier or e-mail, the date of delivery shall be deemed the effective date thereof. The respective attorneys for the parties, as identified in paragraph 1.2 are hereby authorized to give and receive any notice which is required under this Contract.

40.   It is expressly understood and agreed that delivery of this Contract for inspection or otherwise by Seller to Purchaser or Purchaser's attorney shall not constitute an offer or create any rights in favor of Purchaser or others and shall not obligate or be binding upon Seller, and this Contract shall have no force or effect unless and until the same is fully executed and delivered by Seller to Purchaser's attorneys.

41.   This Contract may be executed in several counterparts, each of which shall be an original and all of which when taken together shall constitute but one and the same Contract.

42.   In the event that the check given as down payment and delivered by the Purchaser to Seller upon the execution of this Contract, is dishonored for any reason by the bank upon which it is drawn, then the Seller, in addition to any other rights and remedies which they may have, may declare this Contract null and void and thereupon the Seller shall be relieved from all obligations hereunder.

43.   This transaction is not contingent upon (a) the sale or leasing by Purchaser of Purchaser's current residence or any other real property, or (b) Purchaser's ability to obtain financing or otherwise finance this transaction, or (c) any other matter or condition except as may be expressly stated to the contrary herein.

44.    Seller makes no representation or warranty that, at the Closing Date, the Maintenance payable will not have increased from the sum set forth in paragraph 1.17.

45.    Supplementing paragraph 4.1.7, Seller has entered into (i) a lease of that portion of the Premises known as the North Gallery, however, at the Closing Date, as hereinafter defined, the entire Premises will be delivered vacant, (ii) a Comprehensive Settlement Agreement dated July 13, 2000 a copy of which is attached hereto, and (iii) a Façade and Air Conditioning Agreement dated April 3, a copy of which is attached hereto.

46.    Supplementing paragraph 1.16, Purchaser shall pay an additional deposit to Seller in the amount of $750,000.00 (the "Additional Deposit") the earlier of (i) 5 business days following the closing of the Purchaser's condominium apartment located at 255 Hudson Street, New York, New York, or (ii) August 1, 2007, which TIME SHALL BE OF THE ESSENCE.

47.    The date of Closing (the "Closing Date") shall be October 1, 2007. TIME SHALL BE OF THE ESSENCE with respect to Purchaser's obligation to close. Notwithstanding the foregoing, and modifying paragraph 16.1, in the event that the Seller's tenant, currently occupying a portion of the Premises does not vacate the premises by the Closing Date, then the Seller shall have the right to adjourn the Closing Date for a period not to exceed 120 calendar days. Upon such adjournment, then Seller shall have the right to establish the Closing Date upon not less than 30 calendar days prior written notice (the "Notice") and the Closing Date identified in such Notice shall be TIME IS OF THE ESSENCE.

48.    Beginning on the date hereof and continuing until the Closing Date, the Purchaser shall have the right to show the Premises to prospective tenants and purchasers, at reasonable times and upon at least 1 day prior notice to Seller. Purchaser acknowledges and agrees that there will be many occasions when Seller will not be present to show the Premises, in which event Purchaser shall not have access to the Premises, and Purchaser agrees that Purchaser shall not have any claim against Seller based upon such unavailability.

49.    Notwithstanding anything to the contrary contained in this Agreement, Purchaser acknowledges and agrees that in the event that Purchaser fails to pay the Additional Deposit by August 1, 2007, or fails to close this transaction by the Closing Date, Time Being Of The Essence with respect to each event, either of such events shall constitute a material default by Purchaser, whereupon this Agreement shall be deemed terminated without any action or notice by Seller, Seller shall be entitled to retain the Deposit and Additional Deposit, as the case may be, together with interest earned thereon, if any, as liquidated damages (Seller's actual damages being difficult or impossible to ascertain) and Seller

specifically hereby waives any and all claims that may exist with respect thereto. In the event of such termination, neither party shall have any further rights, obligations or liability to or against the other with respect to this Agreement.

_____
RONALD LUSKER

_____
MARILYN KOCHER LUSKER

_____
CHRISTIAN STOKES

SECOND RIDER TO CONTRACT OF SALE
BETWEEN RONALD LUSKER AND MARILYN KOCHER LUSKER, AS SELLER
AND CHRISTIAN STOKES, AS PURCHASER
OF THE PROPRIETARY LEASE
TO RESIDENTIAL COOPERATIVE UNIT IR
85-87 MERCER STREET, NEW YORK, NY TOGETHER WITH
15 SHARES OF STOCK IN 85-87 MERCER STREET ASSOCIATES INC.

R1.     In the event of any inconsistency between the provisions of this Second
        Rider and those contained in the printed portion of this Contract of Sale
        and the Rider to which this Second Rider is annexed, the provisions of this
        Second Rider shall govern and be binding.

R2.     The Seller has not been known by any other name other than that as
        represented in this Contract.

R3.     In the event of Purchaser's death prior to the closing, this agreement shall
        terminate, the Contract deposit shall be returned and the parties hereto
        shall have no further rights, obligations or liabilities under the Contract.

R4.     Seller hereby represents that this Contract is subject to and conditioned
        upon there not being any pending litigation against Seller which would
        have a material adverse effect on the Seller's ability to consummate the
        transaction contemplated by this Agreement.

R5.     Seller shall, promptly after receipt thereof, deliver to Purchaser copies of
        any written notices from the Corporation relating to (1) any increase in the
        amount of the monthly Maintenance as set forth in Paragraph 1.17; (2) any
        intended or proposed assessment other than the Assessment as set forth in
        Paragraph 1.18; (3) any intended or proposed changes to the "flip tax" or
        other transfer fee charged by the Corporation or its Managing Agent; (4)
        any proposed amendment or modifications of the Lease, the Certificate of
        Incorporation of the Corporation or the Corporation's By-Laws; (5) any
        proposed construction or repair work the cost of which is intended to be
        borne by the Corporation, its insurers or its shareholders; (6) any
        refinancing or other material change with respect to any mortgage
        affecting the Premises; or (7) any damage or casualty to the Unit or the
        Premises.

R6.     At closing, Seller shall deliver to Purchaser all warranties or guarantees
        relating to the personal property included in this sale, to the extent in
        Seller's possession and unexpired.

R7.     All of the air-conditioning equipment, lighting and plumbing fixtures and
        the electrical, heating and plumbing systems in the unit, to the extent
        Seller's responsibility under the Proprietary Lease, shall be in good

working order at closing. Seller represents that all of the aforementioned air-conditioning equipment, lighting and plumbing fixtures, electrical, heating and plumbing systems in the unit are currently in good working order and Seller further covenants that, to the extent any of the aforementioned items are not Seller's responsibility under the Proprietary Lease, Seller shall use his, her or their "best efforts" to assure that the aforementioned items will be in good working order at Closing.

R8.   Supplementing and modifying the provisions of Paragraph 11 hereof, at the time each party tenders payment of each tax payable by that party, the paying party will furnish the non-paying party with copies of all documents, including correspondence, and checks by which or with which each such tax payment is made. This provision shall survive the Closing.

R9.   The Seller agrees to deliver the Unit vacant and in broom-clean condition at the time of closing.

R10.  The parties mutually agree that all right, title and interest of the Seller in and to any and all personal property which may be in or upon the Premises or Unit and used in connection with the operation thereof except for the items specifically included in paragraph 1.12 of this Agreement, shall be deemed transferred or conveyed to the Purchaser under the deed of conveyance to be delivered, and that no part of the purchase price shall be deemed to have been paid by the Purchaser for the same.

R11.  Seller agrees that, prior to closing, they will remove all personal property not included in the sale.

R12.  At the Closing, Seller shall deliver to Purchaser all keys to the doors of, and mailbox for, the Unit, as well as any applicable Cooperative keys or passes. .

R13.  Seller represents that to the best of their knowledge: (i) any alterations made to the Unit by Seller were done in accordance with all applicable governmental regulations (including, without limitation, all zoning laws and building codes); (ii) all necessary permits and licenses were obtained and all required fees were paid in connection with such alterations; and (iii) all such alterations were approved by the appropriate governmental agency, if required.

R14.  Seller shall have installed in the Unit the requisite number of approved and operational carbon monoxide detectors in compliance with subdivision 5-a of Section 378 of the Executive Law.

R15.   While the Seller may utilize the Contract Deposit and Additional Deposit prior to Closing, Seller shall fully refund the Contract Deposit, Additional Deposit and any interest accrued thereon only in the event that (i) the Seller refuses to close on the Closing Date as same may be extended, or (ii) Purchaser has submitted his application to purchase the Shares and Lease pursuant to paragraphs 6 and R17 of this Agreement, and the Corporation does not give their unconditional approval of such application prior to August 1, 2007, and in no other circumstance.

R16.   Seller shall have the right to stay in possession of the Unit following Closing for a maximum of ten (10) calendar days. If Seller elects to so stay in possession, then (i) apportionments pursuant to paragraph 11.4 shall be made as of midnight of the day preceding Seller's vacating the Unit; (ii) Seller shall pay a use and occupancy fee of One Thousand Dollars per day for each and every date that Seller remains in possession following the Closing Date; Seller and Purchaser shall execute at Closing a Use and Occupancy Agreement in substantially the form as annexed hereto.

R17.   Purchaser shall be obligated to submit his fully completed application including, without limitation, a Loan Commitment Letter, to the Board or its Managing Agent pursuant to paragraph 6 of this Agreement by June 1, 2007 which TIME SHALL BE OF THE ESSENCE. If Purchaser fails to so submit, such failure shall be deemed a material default hereunder, whereupon Seller shall have the right to terminate this Agreement upon one day prior written notice to Purchaser's attorney. In the event of such termination, the Seller shall retain the deposit as liquidated damages and the parties shall have no further rights or obligations hereunder except as described in R18 below. For purposes hereof, the phrase "Loan Commitment Letter" shall have the meaning ascribed to it in section 18.1.2 of this Agreement and the phrase "Institutional Lender" shall have the meaning ascribed to it in section 18.1.1 of this Agreement, notwithstanding that such sections have been crossed out of the pre-printed portion of this Agreement.

R18.   Upon Seller's receipt of the Deposit, the Purchaser shall have the right to file a UCC-1 with the New York City Register's Office, to evidence Purchaser's rights hereunder. Purchaser shall provide Seller's attorney with a copy of any and all UCC-1 statements simultaneously with the filing thereof, and shall also provide Seller's attorney with the filing numbers thereof upon receipt. Upon the termination of this Agreement, or in the event of Purchaser's default of any provision of this Agreement, which determination shall be made by Seller in Seller's sole and reasonable discretion, then Seller shall have the right to file UCC-3 termination statements terminating any and all UCC-1 statements filed by

or on behalf of Purchaser upon prior written notice to Purchaser's attorney. Upon Seller's receipt of the Additional Deposit, Seller must provide Purchaser's attorney with at least 5 days prior written notice prior to being authorized to file the UCC-3 termination statement. With respect to Seller's determination of whether Purchaser is in default, Seller shall be obligated to act in good faith. Notwithstanding the foregoing, if Seller shall receive notice from Seller's lender (which lender has financed Seller's ownership of the Premises and has existing UCC financing statements filed against the Unit) that the filing of the Purchaser's aforesaid UCC financing statements have resulted in (or will result in) a default by Seller under its loan documents with such lender, then Seller is hereby authorized to file UCC-3 termination statements terminating the UCC-1 financing statements filed by the Purchaser, upon prior notice to Purchaser's attorney.

R19.    Purchaser acknowledges that the total monthly assessment, if any, and maintenance payable to the Managing Agent as of February 1, 2007 was $2,956.20 and Seller is not aware whether any part of such amount constitutes an assessment.

R20.    Upon payment of the Additional Deposit, Purchaser shall have the right to assign this Agreement to an entity organized within the State of New York, of which the Purchaser is a principal (the "Assignee"), provided that the Corporation or its Managing Agent and/or Purchaser's Institutional Lender, if any, approve such assignment and further provided that if the Corporation, its Managing Agent and/or the Institutional Lender require Purchaser to guaranty the obligations of the Assignee, under the Lease or the Assignee's financing documents with the Institutional Lender, as the case may be, Purchaser agrees to so guaranty.

*[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]*

PURCHASER:

CHRISTIAN STOKES

SELLER:

RONALD LUSKER

SELLER:

MARILYN KOCHER LUSKER

DATED: The date of the Contract of Sale.