UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CHRISTIAN STOKES,

                              Plaintiff,                    08 Civ. 3667 (CM) (DFE)

              - against -

RONALD LUSKER, MARILYN KOCHER LUSKER,        **DECLARATION OF STEVEN**
EBERT & ASSOCIATES, STEVEN EBERT, ESQ.,       **EBERT, ESQ. IN SUPPORT**
ANDREWS BUILDING CORP., MALLEY GROUP,              **OF THE EBERT**
ERIC MALLEY, 85-87 MERCER STREET              **DEFENDANTS' MOTION TO**
ASSOCIATES, INC.                                      **DISMISS**

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Steven Ebert, Esq., declares under penalty of perjury, pursuant to 28 U.S.C. § 1746:

        1.      I am a member of the defendant law firm Ebert & Associates and an individually

named defendant (collectively referred to as "Ebert") in the above-referenced matter.

        2.      I submit this declaration in support of motion submitted on behalf of Ebert

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking to dismiss the

plaintiff's Complaint, dated April 14, 2008, for failure to state a cause of action upon which

relief can be granted; alternatively asking this Court to convert this motion to Rule 56 summary

judgment and issue an order pursuant to Rule 56 dismissing the complaint and for such other and

further relief as this Court deems just and proper.

        3.      Annexed hereto as Exhibit "A" is a copy of the Complaint filed in the instant

matter, dated April 14, 2008.

        4.      Annexed hereto as Exhibit "B" is a copy of the Contract of Sale, dated March 30,

2007.

5.      Annexed hereto as Exhibit "C" is a copy of the July 27, 2007 letter from the Coop's Board of Directors approving the sale of the 85-87 Mercer Street property.

6.      Annexed hereto as Exhibit "D" is a copy of the August 1, 2007 letter from me to the seller's attorney, Paul F. Peragine, canceling the sale of the 85-87 Mercer Street property.

7.      Annexed hereto as Exhibit "E" is a copy of the Coop's Board of Directors' letter, dated August 1, 2007, confirming that the conditions imposed in their earlier consent are "covered under the Coop's Proprietary Lease."

8.      Annexed hereto as Exhibit "F" is a copy of the Coops Proprietary Lease.

9.      For the reasons set forth in the accompanying Memorandum of Law of the Ebert Defendants in Support of their motion to dismiss, it is respectfully requested that the Court grant the Ebert Defendants' motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.


Dated:      New York, New York
            July 10, 2008


                              **STEVEN EBERT, ESQ.,**


**TO:    Joseph H. Neiman, Esq.,**
        Attorney for the *Plaintiff*
        *Christian Stokes*
        39 Hudson Street
        Hackensack, NJ 07601

        **Barry M. Karson, Esq.**
        Karson & Long, LLP
        Attorneys for *Defendants*
        *Ronald and Marilyn Lusker*
        600 Third Avenue, 15th Floor
        New York, NY 10016

**Steven Ira Fox, Esq.**
Wrobel & Schatz LLP
Attorneys for *Defendants*
*Eric Malley & The Malley Group*
757 Third Ave., Suite 1903
New York, NY 10017

**Bryan J. Mazzola, Esq.**
Cantor, Epstein & Mazzola, LLP
Attorneys for *Defendants*
*85-87 Mercer Street and Andrews Building Corp*
49 West 37th Street
New York, NY 10118

EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'08 CV 3667

CHRISTIAN STOKES,

        Plaintiff,

    vs.

RONALD LUSKER, MARILYN KOCHER LUSKER,
EBERT & ASSOCIATES, STEVEN EBERT, ESQ.,
ANDREWS BUILDING CORP., MALLEY GROUP,
ERIC MALLEY, 85-87 MERCER STREET
ASSOCIATES, INC.,

        Defendants.

CIVIL ACTION NO.

**COMPLAINT AND
JURY DEMAND**



Plaintiff, Christian Stokes, by and through his attorney Joseph H. Neiman, complaining of the Defendants, alleges the following upon information and belief:

### NATURE OF THE CASE

1.    This is an action brought by Christian Stokes against various parties alleging breach of contract with regard to a real estate transaction. In addition, Plaintiff alleges claims for negligence, fraud, and professional mal-practice. By this action, Plaintiff seeks money damages for breach of contract, negligence, fraud with inducement, fraud and professional mal-practice, liquidated, compensatory and punitive damages and attorney's fees.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction under 28 U.S.C. Sec. 1332:a:2. The action is between citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of interest and costs.

3.    Venue is proper in this district pursuant to 28 U.S.C. Sec. 1391, as the acts complained of herein took place in City of New York, State of New York and all defendant's reside or do business in the City of New York, State of New York.

## PARTIES

4.    Plaintiff, Christian Stokes, is an individual of legal age, residing at 11 Marino Park, Mount Merrion Avenue, Blackrock, Dublin, Ireland.

5.    Defendant, Ronald Lusker, is an individual of legal age, residing at 85-87 Mercer Street, New York, New York 10012 and the Seller of the Co-op located at 85-87 Mercer Street, New York, New York.

6.    Defendant, Marilyn Kocher Lusker, is an individual of legal age, residing at 85-87 Mercer Street, New York, New York 10012 and the Seller of the Coop located at 85-87 Mercer Street, New York, New York.

7.    Defendant, Ebert & Associates is the law firm that represented plaintiff in the purchase of the Coop located at 85-87 Mercer Street, New York, New York.

8.    Defendant, Steven Ebert, Esq. is the attorney that represented plaintiff in the purchase of the Coop located at 85-87 Mercer Street, New York, New York.

9.    Defendant, Andrews Building Corp. is the Managing Agent of the Coop located at 85-87 Mercer Street, New York, New York.

2

10.    Defendant, Malley Group is the real estate broker who represented plaintiff in the purchase of the Coop located at 85-87 Mercer Street, New York, New York.

11.    Defendant, Eric Malley is the real estate broker who represented plaintiff in the purchase of the Coop located at 85-87 Mercer Street, New York, New York.

12.    Defendant, 85-87 Mercer Street Associates, Inc., is the cooperative housing corporation.

## AS AND FOR A FIRST CAUSE OF ACTION

13.    Plaintiff, repeats and realleges each and every allegation contained in the Paragraphs 1 through 12 of this Complaint as though each were fully set forth at length herein.

14.    Plaintiff was intending to invest certain sums of money in real estate in the City of New York, State of New York.

15.    Plaintiff contacted defendant Eric Malley of the Malley Group.

16.    In or about March of 2007, Plaintiff was shown a certain coop unit located at 85-87 Mercer Street, New York, New York by Eric Malley of Malley Group.

17.    During those showings, Eric Malley of Malley Group advised plaintiff that this would be a perfect place for a commercial retailer and that the return on the rental that he could obtain for plaintiff would be 1.1 to 1.2 million dollars which would more than cover the mortgage that plaintiff would need to purchase the premises.

18.    At all times the defendant Eric Malley represented to plaintiff that the premises would be more than suitable for such occupancy.

3

19.    Plaintiff then solicited Steven Ebert, Esq. Of Ebert & Associates to represent him in the matter in the purchase of the premises to protect his legal interest and advise him on the purchase of said premises.

20.    At all times, defendants, Erick Malley and Steven Ebert, Esq. knew that the only way plaintiff could financially perform the terms of the agreement was to be able to rent said premises to a commercial retailer.

21.    Unbeknownst to plaintiff at all times, the premises could not be rented to a commercial tenant because of restrictions within both the Coop By-Laws and Deed.

22.    At all times, the Sellers, Ronald Lusker and Marilyn Kocher Lusker knew that plaintiff wanted to rent said premises to a commercial retailer but, not only did they not advise plaintiff but conspired with 85-87 Mercer Street Associates, Inc. and Andrews Building Corp. in order to wrongfully obtain the deposit money plaintiff made in respect to such agreement.

23.    The coop board, 85-87 Mercer Street Associates, Inc. approved the plaintiff to purchase the unit despite the fact that it knew that plaintiff could not financially undertake the transaction. It did this in connection with Ronald Lusker and Marilyn Kocher Lusker to allow the Sellers to fraudulently and unjustly retain plaintiff's deposit of $250,000.00.

## AS AND FOR A SECOND CAUSE OF ACTION

24.    Plaintiff, Christian Stokes, repeats and realleges each and every allegation contained in the Paragraphs 1 through 23 of this Complaint as though each were fully set forth at length herein.

4

25.     Defendants, Ronald Lusker and Marilyn Kocher Lusker are obligated to

return the deposit of $250,000.00 under the following legal theories; unjust enrichment,

fraudulent inducement and violation against the policy of penalties and/or forfeiture.

### AS AND FOR A THIRD CAUSE OF ACTION
### AGAINST DEFENDANTS, 85-87 MERCER STREET
### ASSOCIATES, INC. and ANDREWS BUILDING CORP.

26.     Plaintiff, Christian Stokes, repeats and realleges each and every allegation

contained in the Paragraphs 1 through 25 of this Complaint are realized and incorporated

herein by reference as though fully set forth at length herein.

27.     At all times, the coop agent, Andrews Building Corp., knew plaintiff could

only financially complete the transaction if plaintiff could put in a commercial retailer.

28.     Defendants are obligated to return the monies to plaintiff as they either

negligently approved the purchase or upon information and belief did so in conspiracy

with defendants, Ronald Lusker and Marilyn Kocher Lusker because at all times 85-87

Mercer Street Associates, Inc. and Andrews Building Corp. were aware that the plaintiff

would not and could not apply financially with the terms of the contract.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST DEFENDANTS, MALLEY GROUP
### and ERIC MALLEY

29.     Plaintiff, Christian Stokes, repeats and realleges each and every allegation

contained in the Paragraphs 1 through 28 of this Complaint are realized and incorporated

herein by reference as though fully set forth at length herein.

30.     Eric Malley either intentionally or negligently misrepresented to plaintiff

his ability to obtain commercial tenants and knew or should have known that the plaintiff

would not be able to obtain such tenants and therefore could not financially comply with

the terms of the deal and would eventually lose his deposit of $250,000.00.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST DEFENDANTS, EBERT & ASSOCIATES
## and STEVEN EBERT, ESQ.

31.    Plaintiff, Christian Stokes, repeats and realleges each and every allegation

contained in the Paragraphs 1 through 30 of this Complaint are realized and incorporated

herein by reference as though fully set forth at length herein.

32.    Defendant, Steven Ebert, Esq. was hired to represent plaintiff.

33.    Defendant, Steven Ebert, Esq. failed in his obligation to represent plaintiff

and failed to read the documents which would have enlightened the plaintiff and avoided

this transaction and furthermore, had plaintiff sign the contract without either obtaining

or reviewing all of the necessary documents from the coop board and the sellers.

34.    Additionally, Defendant, Steven Ebert, Esq. failed to provide in plaintiff's

contract that plaintiff would be free to rent to a commercial tenant.

WHEREFORE, Plaintiff respectfully prays this court enter judgment on all

Counts for compensatory damages in the sum of $250,000.00, punitive damages to be

determined by the trier of fact, attorney's fees to be determined by the court, as well as

interest and costs incurred in this action and for such other further relief as this court

deems just and proper.

Dated: April 14, 2008

Joseph H. Neiman, Esq.
Attorney for Plaintiff
179-36 80th Road
Jamaica Estate, New York 11432
(201) 487-0061

6

**JURY DEMAND**

Plaintiff demands trial by jury with respect to all issues so triable.

Dated: April 14, 2008

Joseph H. Neiman, Esq.
Attorney for Plaintiff
179-36 80th Road
Jamaica Estate, New York 11432
(201) 487-0061

7

EXHIBIT "B"

123-Contract of sale cooperative apartment, 7-01
Prepared by The Committee on Condominiums and Cooperatives of the Real Property Section of the New York State Bar Association

Blumberg Excelsior Inc., Publisher NYC 10
www.blumberg.c

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale – Cooperative Apartment

This Contract is made as of March 30, 2007    between the "Seller" and the "Purchaser" identified belo

**1 Certain Definitions and Information**

1.1 The "Parties" are:
1.1.1 "Seller" is:

> RONALD LUSKER
> MARILYN KUCHER LUSKER

*Prior names used by Seller*
Address:   85-87 Mercer Street
           New York, New York 10012

S.S. No.:
1.1.2 "Purchaser":

> CHRISTIAN STORES

Address:   255 Hudson Street, Apt. 4A
           New York, New York 10013

S.S. No.:
1.2 The "Attorneys" are (*name, address and telephone, fax*):
1.2.1 "Seller's Attorney"
       Paul F. Peragine, Esq.
       757 Third Avenue, 19th Floor
       New York, New York 10017
    (212) 973-9100 (212) 222-(212) 973-9101 (Fax)
1.2.2 "Purchaser's Attorney"
       Steven Ebert, Esq.
       Ebert & Associates
       350 Fifth Avenue, Suite 4011
       New York, New York 10118
    (212) 290-4000 (212) 290-7070 (Fax)
1.3 The "Borrower" is the (Seller's) (Purchaser's) Attorney.

1.4 The Managing Agent is (*name, address and telephone, fax*):
       Andrews Building Corp.
       666 Broadway
       New York, New York 10012
    (212) 529-5688/(212) 529-7987 (fax)
1.5 The real estate "Broker(s)" (see ¶12) is/are:

Company Name:   Malley Group

1.6 The name of the cooperative housing corporation ("Corporation") is:

> 85-87 Mercer Street Associates, Inc.

1.7 The "Unit" number is: IR including North Gallery and westerly 2/3 of Cellar

1.8 The Unit is located in "Premises" known as:

> 85-87 Mercer Street

1.9 The "Shares" are the          15          shares of t
Corporation allocated to the Unit.

1.10 The "Lease" is the Corporation's proprietary lease or occupa-
cy agreement for the Unit, given by the Corporation which exp
on

1.11 "Personalty" is the following personal property, to the ext.
existing in the Unit on the date hereof: the refrigerators, freeze
ranges, ovens, built-in microwave ovens, dishwashers, garbage d
posal units, cabinets and counters, lighting fixtures, chandelle
walk-to-wall carpeting, plumbing and heating fixtures, central a
conditioning and/or window or sleeve units, washing machines, dr
ers, screens and storm windows, window treatments, switch pla
door hardware, mirrors, built-ins not excluded in ¶ 1.12 and
—————

1.12 Specifically excluded from this sale is all personal property r
included in ¶ 1.11 and:   All kitchen appliances, kitchen
  shelving, kitchen island and cabinetry; all closet doors; all
  mirrors, and the upstairs bathroom sink and Jacuzzi.

1.13 The sale (does) (*does not*) include Seller's interest in
[Storage]/[Servant's Room]/[Parking Space] ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Leas
1.15 The date scheduled for Closing is   SEE RIDER
("Scheduled Closing Date") is          M (See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $14,000,000.00
    1.16.1 The "Contract Deposit" is: $ 250,000.00
    1.16.2 The "Balance" of the Purchase Price due at Closing is
$13,000,000.00   (See ¶2.2.2)   SEE RIDER
1.17 The monthly "Maintenance" charge is
$ 2,956.20        (See ¶4)
1.18 The "Assessment", if any, payable to the Corporation, as
date of this Contract is $   NONE          , payable as follo

1.19 (*Seller*) (*Purchaser*) shall pay the Corporation's flip tax, tra
fer fee (apart from the transfer agent fee) and/or waiver of option :
("Flip Tax"), if any.
1.20. Financing Options (*Delete two of the following ¶¶ 1.20
1.20.2 or 1.20.3*)

1.20.1 ~~Purchaser may apply for financing in connection with t~~
~~sale and Purchaser's obligation to purchase under this Contract~~
~~contingent upon issuance of a Loan Commitment Letter by the Lc~~
~~Commitment Date (¶ 18.1.3);~~

1.20.2 Purchaser may apply for financing in connection with t
sale but Purchaser's obligation to purchase under this Contract is
contingent upon issuance of a Loan Commitment Letter:

1.20.3 ~~Purchaser shall not apply for financing in connection~~
with this sale.
1.21 If ¶ 1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶ 18 :
a loan of $          for a term of          years
~~such lesser amount or shorter term as applied for or acceptable to~~

~~Purchaser; and the "Loan Commitment Date" for ¶ 18 is ____ calendar days after the Delivery Date.~~

1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶ 17.3.

~~1.23 All "Proposed Occupants" of the Unit are:~~

~~1.23.1 persons and relationship to Purchaser:~~

~~1.23.2 pets)~~

~~1.24 The Contract Deposit shall be held in [a non-] [an] IOLA escrow account. If the account is a non-IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at~~

Depository:
Address:

(See ¶ 29)

1.25 This Contract is [not] continued on attached rider(s).

## 2 Agreement to Sell and Purchase; Purchase Price; Escrow

2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale, for the Purchase Price and upon the terms and conditions set forth in this Contract.

2.2 The Purchase Price is payable to Seller by Purchaser as follows:
2.2.1 the Contract Deposit at the time of signing this Contract, by Purchaser's good check ~~to the order of Escrowee;~~ and

2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶ 17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶ 17.7).

## 3 Personalty

3.1 Subject to any rights of the Corporation or a holder of a mortgage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.

3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.

3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.

## 4 Representations and Covenants

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:

4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make those provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶ 10.1);

4.1.2 the Shares were duly issued, fully paid for and are non-assessable;

4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;

4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶¶ 1.17 and 1.18;

4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶¶ 1.17 and 1.18;

4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable

law. This provision shall not survive Closing.

4.1.7 Seller has not entered into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);

4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶ 1.1.1.

4.1.9 at Closing in accordance with ¶ 15.2:

4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");

4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");

4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;

4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and

4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.

4.2 Purchaser represents and covenants that:

~~4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶ 1.23.~~

4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;

~~4.2.3 if ¶ 1.20.2 applies, Purchaser shall not apply for financing in connection with this purchase.~~

4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);

4.2.5 Purchaser shall not make any representations to the Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶ 4 shall be true and complete at Closing and, except for ¶ 4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

## 5 Corporate Documents

Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).

## 6 Required Approval and References

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶ 1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶ 18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶ 13.1 shall govern.

**7 Condition of Unit and Personalty; Possession**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶ 7.1, broom-clean, vacant and free of all occupants and rights of possession.

**8 Risk of Loss**

8.1 The provisions of General Obligations Law Section 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶ 16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if, without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶ 16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶ 8.4 or ¶ 8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

**9 Closing**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

**10 Closing**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a duly executed assignment thereof to Purchaser in the form required by the Corporation;

10.1.3 FIRPTA documents required by ¶ 25;

10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;

10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;

10.1.6 any documents and payments to comply with ¶ 15.2

10.1.7 If Seller is unable to deliver the documents required in ¶ 10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.

10.2 At Closing, Purchaser shall:

10.2.1 pay the Balance in accordance with ¶ 2.2.2;

10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and

10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.

10.3 At Closing, the Parties shall complete and execute all documents necessary:

10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;

10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and

10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.

10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:

10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and

10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

**11 Closing Fees, Taxes and Apportionments**

11.1 At or prior to Closing,

11.1.1 Seller shall pay, if applicable:

11.1.1.1 the cost of stock transfer stamps; and

11.1.1.2 transfer taxes, except as set forth in ¶ 11.1.2.2

11.1.2 Purchaser shall pay, if applicable:

11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and

11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax").

11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶ 1.19.

11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.

11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, and any other periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of days in the month of Closing.

11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.

11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified, or attorney's escrow check. This ¶ 11.6 shall survive Closing.

11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶ 11.7 shall survive Closing.

**12 Broker**

12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicensed, in connection with this transaction other than the Broker(s) named in ¶ 1.5.

12.2 Seller shall pay the Broker's commission pursuant to a separate

agreement. The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.

12.3 This ¶ 12 shall survive Closing, cancellation or termination of this Contract.

### 13 Defaults, Remedies and Indemnities

13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶ 13.3 as to brokerage commission or sue under ¶ 13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.

13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.

13.3 Subject to the provisions of ¶ 4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶ 13.3 shall survive Closing, cancellation or termination of this Contract.

13.4 In the event any instrument for the payment of the Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an uncollected good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶ 13.1 and to retain all sums as may be collected and/or recovered.

### 14 Entire Agreement; Modification

14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶ 27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement.

14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

### 15 Removal of Liens and Judgments

15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶ 16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶ 4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶ 11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶ 1.15.

15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.

15.3 This ¶ 15 shall survive Closing.

### 16 Seller's Inability

16.1 If Seller shall be unable to transfer the items set forth in ¶ 2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶ 1.20.1 or 1.20.2 applies.

16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.

16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

### 17 Notices and Contract Delivery

17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand, overnight delivery or certified or registered mail; return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶ 17.

17.2 The Contract may be delivered as provided in ¶ 17.1 or by ordinary mail.

17.3 The Contract or each Notice shall be deemed given and received:

    17.3.1 on the day delivered by hand;
    17.3.2 on the business day following the date sent by overnight delivery;
    17.3.3 on the 5th business day following the date sent by certified or registered mail; or
    17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.

17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.

17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.

17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.

17.7 Notice pursuant to ¶¶ 2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

### 18 Financing Provisions

18.1 The provisions of ¶¶ 18.1 and 18.2 are applicable only if ¶ 1.20.1 or 1.20.2 applies.

    18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.

    18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶ 1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

    18.2.1 apply only to an Institutional Lender for a loan on

the Financing Terms (see ¶ 1.21) on the form required by the Institutional Lender containing truthful and complete information, and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of each Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶ 1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶ 18.2 and this ¶ 18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶ 1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶ 18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶ 18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶ 18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶ 18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶ 18.3 shall constitute a waiver of the right to cancel under this ¶ 18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶ 18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶ 12. If this Contract is canceled by Purchaser pursuant to ¶ 18.3.1.4, then Seller shall reim-

burse Purchaser for any non-refundable financing and inspection expenses and other sums reimbursable pursuant to ¶ 16.

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g. Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

**19 Singular/Plural and Joint/Several**
The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

**20 No Survival**
No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

**21 Inspections**
Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

**22 Governing Law and Venue**
This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

**23 No Assignment by Purchaser; Death of Purchaser**
23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in Par. 12.

**24 Cooperation of Parties**
24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶ 24.2 shall survive Closing.

**25 FIRPTA**
The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to purchaser at Closing a Certification of Non-Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶ 25 shall survive Closing.

**26 Additional Requirements**
26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending in rem action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶ 26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party may cancel this Contract (pursuant to ¶ 16.3) by Notice.

**27 Escrow Terms**

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth in ¶ 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract.  At Closing, the Contract Deposit shall be paid by Escrowee to Seller.  If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party.  If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction.  However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶ 22 and shall give Notice of such deposit to each Party.  Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶ 27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation.  Escrowee is acting solely as a stakeholder at the Parties' request  and for their convenience.  Escrowee shall not be liable  to either Party  for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute, Seller and Purchaser shall jointly and  severally (with right of contribution) defend (by attorneys selected by Escrowee),  indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expense incurred in connection with the performance of  Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶ 27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶ 27 shall survive Closing, cancellation or termination of this Contract.

**28 Margin Headings**
The margin headings do not constitute part of the text of this Contract.

**29 Miscellaneous**
This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶17.2 and 17.3. This Contract shall bind and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

**30 Lead Paint**
If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and or Lead-Based Paint Hazards is attached hereto and made a part hereof.

**In Witness Whereof,** the Parties hereto have duly executed this Contract as of the date first above written.

ESCROW TERMS AGREED TO:    SELLER:    PURCHASER:

ESCROWEE.

RONALD LUSKER    CHRISTIAN STOKES

MARILYN KOCHER LUSKER

**Rider to, and Part of, Contract of Sale Between    as Seller
and    as Purchaser for Unit    at**

Suggested Purchaser's representations for use when applicable.

**31 Purchaser's Additional Representations and Covenants**
31.1 Supplementing ¶ 4.2 of the Contract, Purchaser also represents and covenants that:

31.1.1 Purchaser has, and will at Closing have, available unencumbered cash and cash equivalents (including publicly traded securities) in a sum at least equal to (and having a then current value of) the Balance; and

31.1.2 Purchaser has, and will at and immediately following the Closing have, a positive net worth.

31.2 The Maintenance and the monthly amount of the Assessment (if any) do not aggregate more than 25% of the current total gross monthly income of the individuals comprising the Purchaser;

31.3 (if ¶ 1.20.1 or ¶ 1.20.2 applies) the monthly debt service (interest and amortization of principal, if any) of the proposed financing, together with the Maintenance and the monthly Assessment amount (if any), do not aggregate more than 35% of said current total gross monthly income.

32 Supplementing paragraph 4.1, Seller has no actual knowledge of a material default or condition which the Lessee is required to cure under the Lease and which remains uncured. If, prior to Closing, Seller acquires knowledge of a such default or condition which the Lessee would be required to cure, then Seller shall cure same at or prior to Closing. This provision shall not survive closing.

The Parties have duly executed this Rider as of the same date as the Contract.

SELLER:    PURCHASER:

RONALD LUSKER    CHRISTIAN STOKES

MARILYN KOCHER LUSKER

### Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure** (Initial)

(a)  Presence of lead-based paint and/or lead-based paint hazards (check one below):

☐  Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).
_____
_____

☒  Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)  Records and reports available to the seller (check one below):

☐  Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).
_____
_____

☒  Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

*C.S.*  (c)  Purchaser has received copies of all information listed above.
*C.S.*  (d)  Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
*C.S.*  (e)  Purchaser has (check one below):

☐  Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint or lead-based paint hazards; or

☒  Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

_____  (f)  Agent has informed the seller of the seller's obligations under 42 U.S.C. 4582(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| | | |
|---|---|---|
| Seller  RONALD LUSKER _____ Date | | Seller  MARILYN KOCHER LUSKER _____ Date |
| Agent _____ Date | | Agent _____ Date |
| Purchaser _____ Date | | Purchaser  CHRISTIAN STOKES  3/27/07 Date |

RIDER TO CONTRACT OF SALE
Between
RONALD LUSKER and MARILYN KOCHER LUSKER, COLLECTIVELY, SELLER

and

CHRISTIAN STOKES
as PURCHASER

32      In the event of any inconsistency between the provisions of this Rider and those contained in the Contract of Sale to which this Rider is annexed, the provisions of this Rider shall govern.

33      Supplementing and modifying Paragraph 4, it is agreed as follows:

      A.      A pledge of the Shares and Lease by Seller in connection with any financing obtained by Seller shall not be deemed a misrepresentation or breach under Paragraph 4, provided that at closing such pledge shall have been terminated and the Shares and Lease are transferred free of any such security interests.

      B.      The Shares and Lease are subject to a general lien for unpaid maintenance charges in favor of the Corporation to secure payment of Seller's obligations under the Lease; however, no charges will be owed to the Corporation under such lien at closing.

34      Supplementing Paragraph 6, Purchaser represents and warrants that he has no knowledge of any matter relating to his character that would constitute a reasonable ground for failure to receive approval from the directors, stockholders or managing or selling agent of the Corporation, and particularly that he has not filed a bankruptcy or insolvency proceeding or been convicted of a felony.

35      Supplementing and modifying Paragraph 7, it is agreed that:

      A.      Seller is not obligated to install any equipment or appliances in the unit or otherwise make any improvement or decoration to the Unit or its equipment, appliances and, fixtures, except that the appliances shall be in working order at Closing.

      B.      Purchaser acknowledges having entered into this Contract without relying upon any promises, statements, representations, warranties, conditions or other inducements, express or implied, oral or written, not set forth herein.

36. Supplementing and modifying Paragraph 11, a letter from the Corporation or its managing agent as to the status of the maintenance and assessments shall be sufficient for determining the apportionments.

37. The acceptance of the Shares and the assumption of the Lease by Purchaser shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Contract except those which specifically survive Closing.

38. This Contract shall be interpreted without the aid of any presumption against the party drafting or causing the drafting of the provision in question.

39. Any notice or communication required or desired to be given hereunder shall be valid only if in writing, sent by certified mail or by overnight courier or e-mail and addressed to the respective parties with a copy sent, by like mail, to their respective attorneys, or to such other address or addresses as the parties hereto may hereafter designate by notice given in the manner provided for herein. If any such notice is mailed, the date of mailing in a United States Branch Post Office shall be deemed the effective dated thereof. If any such notice is delivered by overnight courier or e-mail, the date of delivery shall be deemed the effective date thereof. The respective attorneys for the parties, as identified in paragraph 1.2 are hereby authorized to give and receive any notice which is required under this Contract.

40. It is expressly understood and agreed that delivery of this Contract for inspection or otherwise by Seller to Purchaser or Purchaser's attorney shall not constitute an offer or create any rights in favor of Purchaser or others and shall not obligate or be binding upon Seller, and this Contract shall have no force or effect unless and until the same is fully executed and delivered by Seller to Purchaser's attorneys.

41. This Contract may be executed in several counterparts, each of which shall be an original and all of which when taken together shall constitute but one and the same Contract.

42. In the event that the check given as down payment and delivered by the Purchaser to Seller upon the execution of this Contract, is dishonored for any reason by the bank upon which it is drawn, then the Seller, in addition to any other rights and remedies which they may have, may declare this Contract null and void and thereupon the Seller shall be relieved from all obligations hereunder.

43. This transaction is not contingent upon (a) the sale or leasing by Purchaser of Purchaser's current residence or any other real property, or (b) Purchaser's ability to obtain financing or otherwise finance this transaction, or (c) any other matter or condition except as may be expressly stated to the contrary herein.

44.   Seller makes no representation or warranty that, at the Closing Date, the Maintenance payable will not have increased from the sum set forth in paragraph 1.17.

45.   Supplementing paragraph 4.1.7, Seller has entered into (i) a lease of that portion of the Premises known as the North Gallery, however, at the Closing Date, as hereinafter defined, the entire Premises will be delivered vacant, (ii) a Comprehensive Settlement Agreement dated July 13, 2000 a copy of which is attached hereto, and (iii) a Façade and Air Conditioning Agreement dated April 3, a copy of which is attached hereto.

46.   Supplementing paragraph 1.16, Purchaser shall pay an additional deposit to Seller in the amount of $750,000.00 (the "Additional Deposit") the earlier of (i) 5 business days following the closing of the Purchaser's condominium apartment located at 255 Hudson Street, New York, New York, or (ii) August 1, 2007, which TIME SHALL BE OF THE ESSENCE.

47.   The date of Closing (the "Closing Date") shall be October 1, 2007. TIME SHALL BE OF THE ESSENCE with respect to Purchaser's obligation to close. Notwithstanding the foregoing, and modifying paragraph 16.1, in the event that the Seller's tenant, currently occupying a portion of the Premises does not vacate the premises by the Closing Date, then the Seller shall have the right to adjourn the Closing Date for a period not to exceed 120 calendar days. Upon such adjournment, then Seller shall have the right to establish the Closing Date upon not less than 30 calendar days prior written notice (the "Notice") and the Closing Date identified in such Notice shall be TIME IS OF THE ESSENCE.

48.   Beginning on the date hereof and continuing until the Closing Date, the Purchaser shall have the right to show the Premises to prospective tenants and purchasers, at reasonable times and upon at least 1 day prior notice to Seller. Purchaser acknowledges and agrees that there will be many occasions when Seller will not be present to show the Premises, in which event Purchaser shall not have access to the Premises, and Purchaser agrees that Purchaser shall not have any claim against Seller based upon such unavailability.

49.   Notwithstanding anything to the contrary contained in this Agreement, Purchaser acknowledges and agrees that in the event that Purchaser fails to pay the Additional Deposit by August 1, 2007, or fails to close this transaction by the Closing Date, Time Being Of The Essence with respect to each event, either of such events shall constitute a material default by Purchaser, whereupon this Agreement shall be deemed terminated without any action or notice by Seller, Seller shall be entitled to retain the Deposit and Additional Deposit, as the case may be, together with interest earned thereon, if any, as liquidated damages (Seller's actual damages being difficult or impossible to ascertain) and Seller

specifically hereby waives any and all claims that may exist with respect thereto. In the event of such termination, neither party shall have any further rights, obligations or liability to or against the other with respect to this Agreement.

_____
RONALD LUSKER

_____
MARILYN KOCHER LUSKER

_____
CHRISTIAN STOKES

SECOND RIDER TO CONTRACT OF SALE
BETWEEN RONALD LUSKER AND MARILYN KOCHER LUSKER, AS SELLER
AND CHRISTIAN STOKES, AS PURCHASER
OF THE PROPRIETARY LEASE
TO RESIDENTIAL COOPERATIVE UNIT 1R
85-87 MERCER STREET, NEW YORK, NY TOGETHER WITH
15 SHARES OF STOCK IN 85-87 MERCER STREET ASSOCIATES INC.

R1.     In the event of any inconsistency between the provisions of this Second
Rider and those contained in the printed portion of this Contract of Sale
and the Rider to which this Second Rider is annexed, the provisions of this
Second Rider shall govern and be binding.

R2.     The Seller has not been known by any other name other than that as
represented in this Contract.

R3.     In the event of Purchaser's death prior to the closing, this agreement shall
terminate, the Contract deposit shall be returned and the parties hereto
shall have no further rights, obligations or liabilities under the Contract.

R4.     Seller hereby represents that this Contract is subject to and conditioned
upon there not being any pending litigation against Seller which would
have a material adverse effect on the Seller's ability to consummate the
transaction contemplated by this Agreement.

R5.     Seller shall, promptly after receipt thereof, deliver to Purchaser copies of
any written notices from the Corporation relating to (1) any increase in the
amount of the monthly Maintenance as set forth in Paragraph 1.17; (2) any
intended or proposed assessment other than the Assessment as set forth in
Paragraph 1.18; (3) any intended or proposed changes to the "flip tax" or
other transfer fee charged by the Corporation or its Managing Agent; (4)
any proposed amendment or modifications of the Lease, the Certificate of
Incorporation of the Corporation or the Corporation's By-Laws; (5) any
proposed construction or repair work the cost of which is intended to be
borne by the Corporation, its insurers or its shareholders; (6) any
refinancing or other material change with respect to any mortgage
affecting the Premises; or (7) any damage or casualty to the Unit or the
Premises.

R6.     At closing, Seller shall deliver to Purchaser all warranties or guarantees
relating to the personal property included in this sale, to the extent in
Seller's possession and unexpired.

R7.     All of the air-conditioning equipment, lighting and plumbing fixtures and
the electrical, heating and plumbing systems in the unit, to the extent
Seller's responsibility under the Proprietary Lease, shall be in good

working order at closing. Seller represents that all of the aforementioned air-conditioning equipment, lighting and plumbing fixtures, electrical, heating and plumbing systems in the unit are currently in good working order and Seller further covenants that, to the extent any of the aforementioned items are not Seller's responsibility under the Proprietary Lease, Seller shall use his, her or their "best efforts" to assure that the aforementioned items will be in good working order at Closing.

R8.    Supplementing and modifying the provisions of Paragraph 11 hereof, at the time each party tenders payment of each tax payable by that party, the paying party will furnish the non-paying party with copies of all documents, including correspondence, and checks by which or with which each such tax payment is made. This provision shall survive the Closing.

R9.    The Seller agrees to deliver the Unit vacant and in broom-clean condition at the time of closing.

R10.    The parties mutually agree that all right, title and interest of the Seller in and to any and all personal property which may be in or upon the Premises or Unit and used in connection with the operation thereof except for the items specifically included in paragraph 1.12 of this Agreement, shall be deemed transferred or conveyed to the Purchaser under the deed of conveyance to be delivered, and that no part of the purchase price shall be deemed to have been paid by the Purchaser for the same.

R11.    Seller agrees that, prior to closing, they will remove all personal property not included in the sale.

R12.    At the Closing, Seller shall deliver to Purchaser all keys to the doors of, and mailbox for, the Unit, as well as any applicable Cooperative keys or passes.

R13.    Seller represents that to the best of their knowledge: (i) any alterations made to the Unit by Seller were done in accordance with all applicable governmental regulations (including, without limitation, all zoning laws and building codes); (ii) all necessary permits and licenses were obtained and all required fees were paid in connection with such alterations; and (iii) all such alterations were approved by the appropriate governmental agency, if required.

R14.    Seller shall have installed in the Unit the requisite number of approved and operational carbon monoxide detectors in compliance with subdivision 5-a of Section 378 of the Executive Law.

R15.   While the Seller may utilize the Contract Deposit and Additional Deposit prior to Closing, Seller shall fully refund the Contract Deposit, Additional Deposit and any interest accrued thereon only in the event that (i) the Seller refuses to close on the Closing Date as same may be extended, or (ii) Purchaser has submitted his application to purchase the Shares and Lease pursuant to paragraphs 6 and R17 of this Agreement, and the Corporation does not give their unconditional approval of such application prior to August 1, 2007, and in no other circumstance.

R16.   Seller shall have the right to stay in possession of the Unit following Closing for a maximum of ten (10) calendar days. If Seller elects to so stay in possession, then (i) apportionments pursuant to paragraph 11.4 shall be made as of midnight of the day preceding Seller's vacating the Unit; (ii) Seller shall pay a use and occupancy fee of One Thousand Dollars per day for each and every date that Seller remains in possession following the Closing Date; Seller and Purchaser shall execute at Closing a Use and Occupancy Agreement in substantially the form as annexed hereto.

R17.   Purchaser shall be obligated to submit his fully completed application including, without limitation, a Loan Commitment Letter, to the Board or its Managing Agent pursuant to paragraph 6 of this Agreement by June 1, 2007 which TIME SHALL BE OF THE ESSENCE. If Purchaser fails to so submit, such failure shall be deemed a material default hereunder, whereupon Seller shall have the right to terminate this Agreement upon one day prior written notice to Purchaser's attorney. In the event of such termination, the Seller shall retain the deposit as liquidated damages and the parties shall have no further rights or obligations hereunder except as described in R18 below. For purposes hereof, the phrase "Loan Commitment Letter" shall have the meaning ascribed to it in section 18.1.2 of this Agreement and the phrase "Institutional Lender" shall have the meaning ascribed to it in section 18.1.1 of this Agreement, notwithstanding that such sections have been crossed out of the pre-printed portion of this Agreement.

R18.   Upon Seller's receipt of the Deposit, the Purchaser shall have the right to file a UCC-1 with the New York City Register's Office, to evidence Purchaser's rights hereunder. Purchaser shall provide Seller's attorney with a copy of any and all UCC-1 statements simultaneously with the filing thereof, and shall also provide Seller's attorney with the filing numbers thereof upon receipt. Upon the termination of this Agreement, or in the event of Purchaser's default of any provision of this Agreement, which determination shall be made by Seller in Seller's sole and reasonable discretion, then Seller shall have the right to file UCC-3 termination statements terminating any and all UCC-1 statements filed by

or on behalf of Purchaser upon prior written notice to Purchaser's attorney. Upon Seller's receipt of the Additional Deposit, Seller must provide Purchaser's attorney with at least 5 days prior written notice prior to being authorized to file the UCC-3 termination statement. With respect to Seller's determination of whether Purchaser is in default, Seller shall be obligated to act in good faith. Notwithstanding the foregoing, if Seller shall receive notice from Seller's lender (which lender has financed Seller's ownership of the Premises and has existing UCC financing statements filed against the Unit) that the filing of the Purchaser's aforesaid UCC financing statements have resulted in (or will result in) a default by Seller under its loan documents with such lender, then Seller is hereby authorized to file UCC-3 termination statements terminating the UCC-1 financing statements filed by the Purchaser, upon prior notice to Purchaser's attorney.

R19.  Purchaser acknowledges that the total monthly assessment, if any, and maintenance payable to the Managing Agent as of February 1, 2007 was $2,956.20 and Seller is not aware whether any part of such amount constitutes an assessment.

R20.  Upon payment of the Additional Deposit, Purchaser shall have the right to assign this Agreement to an entity organized within the State of New York, of which the Purchaser is a principal (the "Assignee"), provided that the Corporation or its Managing Agent and/or Purchaser's Institutional Lender, if any, approve such assignment and further provided that if the Corporation, its Managing Agent and/or the Institutional Lender require Purchaser to guaranty the obligations of the Assignee, under the Lease or the Assignee's financing documents with the Institutional Lender, as the case may be, Purchaser agrees to so guaranty.

*[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]*

PURCHASER:

_____
CHRISTIAN STOKES

SELLER:

_____
RONALD LUSKER

SELLER:

_____
MARILYN KOCHER LUSKER

DATED: The date of the Contract of Sale.

## COMPREHENSIVE SETTLEMENT AGREEMENT

**This Comprehensive Settlement Agreement is made by and among: 85-87 Mercer Street Associates, Inc. (hereinafter "85 MSAI"), a New York business corporation, maintaining its place of business at 85-87 Mercer Street, New York, New York 10012, and**

Ron Lusker and Marilyn Kocher Lusker (hereinafter the "Luskers"), residing at 85-87 Mercer Street, New York, New York 10012
[85 MSAI and the Luskers are hereinafter collectively referred to hereinafter as "the parties"]

WITNESSETH THAT :

WHEREAS the parties have heretofore had various disagreements over maintenance obligations, repair obligations and other matters pertaining to the Building; and,

WHEREAS 85 MSAI and the Luskers have determined and agree that it is in their mutual interests to achieve compromise positions on all outstanding disagreements and amicably resolve all disputes between them in the form of a comprehensive settlement;

NOW, THEREFORE, the undersigned parties hereto hereby agree as follows:

1. Defined Terms: Each of the following terms shall have the meaning set forth below:

"Building" means and refers to the double-wide, five story plus cellar loft building located at and known as "85-87 Mercer Street" located in the SoHo district of the Borough of Manhattan of the City of New York is owned by the New York business corporation known as "85-87 Mercer Street Associates, Inc." [hereinafter "85 MSAI"].

"Cellar Occupancy Rights" [hereinafter " COR(s)"] means and refers to proprietary rights to use and occupy various portions of the Buildings cellar space as adjunct storage space to their respective lofts which 85 MSAI sold to certain of its then-shareholders in 1986.

"Luskers CORs" means and refers to the Luskers exclusive right to use and occupy that portion of the Buildings cellar separated from the common areas and storage spaces of other shareholders by and situated west of the existing full-width, floor-to-ceiling (north-south) demising wall; the parties agree that such space comprises approximately two-thirds (2/3 rds) of non-common area of the Buildings cellar [as indicated on the drawings (hereinafter referred to as the "PL Drawings") annexed to the Proprietary Lease of even date herewith between the parties hereto] and is incorporated into the Luskers first floor

(continued)

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 2 of 12

rear residential loft by an internal, steel staircase situated along the north wall.

"CORs Contribution Amount" [hereinafter the "CORSCA"] means and refers to the annual rate which purchasers of all CORs agree to contribute to the operation and maintenance of the Building in consideration of their ownership, use and occupancy of cellar space (exclusive of common areas) for private purposes, specifically an annual rate equal to 40% (.4) of the corresponding annual Upper Floor Contribution Amount. Luskers CORSCA Amount means and refers to two-thirds (2/3rds) of the full CORSCA amount which the parties agree is [20% x .4 x .667=] 5.33% of the annual cost of operating and maintaining the Building.

"Common Shares" means and refers to the one hundred (100) issued, outstanding and fully paid common shares of 85 MSAI allocated on the basis of twenty (20) common shares to each of the five (5) floors (excluding the cellar) and thereafter divided among the respective occupants of each floor in connection with 85 MSAIs incorporation and purchase of the Building.

"DoBs" means and refers to the New York Department of Buildings.

"1-S Loft" means and refers to the 750 square foot southernmost street level loft unit facing Mercer Street between the south entrance to the Building and the adjacent first floor loft space occupied by The Enchanted Forest Gallery. Notwithstanding anything to contrary provided herein, the parties further acknowledge that the shareholder of the I-S Loft may pay a higher rate of annual maintenance than shall the residential shareholders for so long as the I-S Loft is used in whole or in part for commercial purposes.

"North Gallery" means and refers to the 850 square foot northernmost street level loft space facing Mercer Street adjacent to the north entrance to the Building. It is currently occupied by "The Enchanted Forest Gallery".

"Upper Floor Contribution Amount" means and refers to the twenty (20%) per cent share of the 85 MSAIs annual expenditures to operate and maintain the Building historically (while the I-S Loft was occupied and used solely for residential purposes) allocated to and paid by the tenant-shareholders occupying any of the Buildings five (5) upper floors (i.e., excluding the cellar).

2. Luskers Share Holdings : 85 MSAI hereby acknowledges and agrees that the Luskers own fifteen (15) of the one hundred (100) fully paid, issued and

**(continued)**

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 3 of 12

outstanding 85 MSAI Common Shares and the CORs pertaining to the westerly two-thirds (2/3 rds) of the Buildings cellar as hereinabove described and defined as the Luskers CORs. The parties further acknowledge that 85 MSAI has allocated five (5) of the Luskers fifteen (15) Common Shares to the North Gallery space.

3. Luskers Area of Occupancy: 85 MSAI hereby acknowledges and agrees that pursuant to the ownership of shares and CORs described in the immediately preceding paragraph, the Luskers are the rightful primary tenants of the Buildings first floor (excluding the 1-S Loft but specifically including the North Gallery as shown on the PL Drawings). With the exception of the North Gallery, the parties agree that the first floor and cellar portions of the Luskers loft are respectively "joint living work quarters for artists" ["jlwqa"] and "accessory storage" to the Luskers jlwqa area.

4. Connecting Internal Stairway: The parties acknowledge that pursuant to alterations building plans approved by the DoBs (attached hereto) the Luskers have constructed an internal steel staircase connecting and integrating the Luskers (westerly) portion of cellar to / into their first floor rear jlwqa loft. The Luskers agree that they shall be solely and exclusively responsible for and shall promptly make all modifications (if any) which the DoBs may require relating only to the connecting internal stairway floor and cellar portions of the Luskers loft for the Building to receive its Cerificate of Occupancy. 85 MSAI undertakes and agrees to promptly give (and cause the Buildings architect to give) the Luskers written notice (including copies of any pertinent DoBs inspection reports or the like) specifying objections or building code violations (if any) which the DoBs may raise concerning the internal staircase, to afford the Luskers a reasonable opportunity to address and resolve such objections or violations (if any) and further undertakes and agrees to take no action relating to such staircase unless required to do so by the DoBs (or other governmental authority, if any, with appropriate jusrisdiction). The Luskers agree to indemnify 85 MSAI for any and all fines and other claims or liability (including reasonable attorneys fees and expenses) assessed against 85 MSAI in connection with such staircase and the use and renovation of the cellar portion of the Luskers' loft.

5. North Gallery Rentals; Agreed Limitation of Permissible Uses: 85 MSAI acknowledges and agrees that the Luskers are entitled to rightfully retain for their own account the rental proceeds they derive from their sub-tenants occupying the North Gallery. Subject to the following limitations stated below in this Section 5, 85 MSAI acknowledges and agrees that the Luskers have the right to sub-let the North Gallery to sub-tenants of their choosing without the approval or consent of 85 MSAI. The Luskers agree that they shall not and shall not knowingly permit their sub-tenants occupying the North

(continued)

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 4 of 12

Gallery:

(a) to sell or / distribute salacious, pornographic or other sexually explicit printed or video matter in or from the North Gallery, or

(b) to extend the operating hours of the enterprise occupying the North Gallery beyond 8:00 p.m. without the prior written consent of 85 MSAIs board of directors, or

(c) to change the existing retail use of that space into a restaurant, night club, fast food franchise or similar use involving the preparation in the premises and sale for on-site consumption of food(s) and / or beverages, provided, however, this provision shall not impair diminish the right of The Enchanted Forest Gallery (or any successor sub-tenant) to provide its employees and / or retail customers with light refreshment (i.e., coffee / soda, cookies, etc.) in ancillary support of its primary retail activities, or

(d) to conduct dry-cleaning or other similar activities involving the use of malodorous chemicals or producing loud noise levels outside the North Gallery, or

(e) to engage in any activity which devalues their property, or unreasonably diminishes or impairs other shareholders quiet enjoyment of their respective residential units.

(f) The Luskers further agree that they will not knowingly permit their sub-tenants occupying the North Gallery to use that space in any manner which does not comply in all respects with the existing NYC Zoning Resolutions.

The parties acknowledge that in the event of the Luskers' violation of any of the foregoing paragraphs (a) through (f), the Luskers shall have ninety (90) days from their receipt of written notice of such violation to cure such violation.

6. Luskers Current Obligation to Contribute to the Cost of Operating and Maintaining the Building: The parties agree that the Luskers pro-rata share of the annual expense of operating and maintaining the Building in respect of all of the space they occupy in the Building (including the North Gallery, the rear portion of the first floor and the westerly portion of the cellar defined by the existing demising wall and running the entire lateral width of the Building) is [15% + 5.33% (the Luskers CORSCA payment)] is 20.33%.

7. Upward Adjustment of the Luskers Contribution to the CORSCA:

**(continued)**

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 5 of 12

(A) Formal Modification of Legally Permitted Use(s): In the event that the existing accessory storage classification of any portion of the Luskers cellar space is formally changed by DoBs written approval of modified alterations building plans permitting such space to be lawfully used as residential (as distinguished from jlwqa accessory storage) space, from and after the date of such DoBs written approval the CORSCA applicable to such reclassified portion of the Luskers cellar space shall be calculated on the basis of 2/3rds of .75 (75/100 ths) of the Upper Floor Contribution; it is expressly understood and agreed that if the Luskers entire cellar space should be formally reclassified as legal residential space, the Luskers annual CORSCA in respect of such reclassified cellar space shall not exceed 50% of an entire Upper Floor Contribution in that year (adjusted for the number of months remaining after such reclassification), and in succeeding years provided that Lusker has not transferred by any means such space to any third party. In the event that the Luskers shall transfer by any means their rights to use and/or occupy the reclassified residential cellar space to any person, vehicle (i.e. trust) or entity, 85 MSAI shall have the right to require the transferee of such space to contribute to the Building's maintenance at same upper floor rate required of all other residential shareholders of the Building.

(B) Transfer of Shares Pertaining to the North Gallery: In the event the Luskers shall transfer by any means whatsoever their five (5) Common Shares allocated to the North Gallery (either separately or together with their remaining Common Shares and CORs) to any person, vehicle (i.e. trust) or entity, the parties agree that 85 MSAI shall have the right to require such transferee from and after the date of such transfer to pay to 85 MSAI a monthly maintenance contribution rate in respect of such five (5) (North Gallery) Common Shares in an amount equal to but not greater than the maintenance contribution rate being paid to 85 MSAI at the date of such sale by the owner of the five (5) Common Shares pertaining to the 1-S Loft.

(C) The Luskers acknowledge and agree that at no time and under no circumstance may the Luskers tranfer their cellar space independent of the simultaneous transfer of the Luskers first floor loft space to the same transferee.

8. Repairs to the Buildings Westerly Extension: The parties acknowledge and agree

(A) that the westerly area of the Buildings first floor and cellar extends approximately nine (9') feet beyond the wall defining the western edge of the Buildings upper floors (i.e., floors two through five),

(continued)

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 6 of 12

(B) that this westerly extension is enclosed by original construction brick walls defining its south, west and north sides and covered by a skylight,

(C) that the brick walls and skylight defining the westerly extension of the Building are structural features of the Building which --subject to the Luskers warranty obligations pursuant to Section 13 below-- 85 MSAI is solely responsible to maintain in good repair and condition.

(D) that unrepaired damage to the westerly extensions original brick walls and skylight exists which must be repaired and brought into compliance with applicable requirements of the NYC Building Code before the Building can qualify for its Certficate of Occupancy under pertinent provisions of the Multiple Dwelling Law and the NYC Building Code.

9. Agreed Extension Repairs: The parties acknowledge and agree that in October, 1998 the Luskers caused NYS licensed architect David Turner (maintaining his offices at 363 Seventh Avenue, New York City) to inspect the Buildings westerly extension, analyze the existing condition of its structural features and define the repairs necessary thereto in documents (including a letter and task list) and architectural drawings (supported by photographs of the area) which were provided to the Buildings senior counsel and, more recently, provided to 85 MSAIs current architect, George Knafo, and Messrs. Lombardi and Yamner as representatives of 85 MSAI. 85 MSAI acknowledges that Mr. Knafo, having personally inspected the Luskers loft with particular attention to the brick walls defining its south, west and north sides and the skylight, concurs in Mr. Turners definition of the repair work required to bring those structural features defining rear portion of the Luskers loft into compliance with the NYC Building Code (such repairs being hereinafter referred to as the "Agreed Extension Repairs" or "AERs").

10. Responsibility for the AERs: In light of the direct impact which the AERs will have upon the Luskers primary living space, the parties hereto agree that the Luskers shall be, for so long as they are not in material breach of this Agreement, exclusively responsible for the completion of the AERs within one hundred twenty (120) days following execution of this agreement and further agree that the Luskers shall have, for so long as they are not in material breach of this Agreement, the exclusive right to engage at their sole cost and expense contractors of their choice to complete the AERs in a timely manner under Mr. Turners professional direction (as a Directive 14-75 project) with Mr. Knafos oversight; each contractor engaged by the Luskers shall execute the Buildings "alterations letter" (a copy of which is attached hereto) and pursuant thereto shall be required to conform to the Buildings standard house rules and regulations relating performing work in the Building applicable to all contractors working in the Building. 85 MSAI
**(continued)**

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 7 of 12

shall afford the workmen making the AERs reasonable access to those areas of the Building (excluding the interior of any upper floor residential unit) necessary to accomplish their work; the Luskers shall afford Mr. Knafo (as the Buildings architect) and John Lombardi and David Yamner, as 85 MSAIs representatives, reasonable access to their loft to inspect and monitor the progress of the AERs. The Luskers shall be exclusively responsible for any damage to their loft unit which may be sustained in consequence of the actions of contractors engaged to perform AERs.

11. Indemnification; Responsibility for Materialmens / Workmens Liens: In consideration of the agreements made herein, the Luskers undertake and agree to indemnify 85 MSAI against damages or claims (including reasonable attorneys fees and expenses) by any party (including but not limited to workmen and contractors) arising from the undertaking and performance of the AERs and any and all work done in connection therewith. The Luskers further undertake and agree to be exclusively responsible for prompt removal of any workmens or materialmens lien arising from the AERs.

12. Commencement and Timely Completion of the AERs: Acknowledging that the AERs will require opening the Building's external walls and the skylight enclosing the Luskers residential quarters and that the AERs are a material element in the repairs required for the Building to qualify for its Certificate of Occupancy, the parties agree that the Luskers will commence the AERs as soon as practicable (in light of weather) following execution hereof and thereafter use their best efforts to cause the AERs to be completed in a timely manner consistent with quality workmanship and, upon completion, to be promptly certified to the NYC Building Department by architect David Turner. The AERs shall be and be deemed to be complete and Luskers obligations (except with regard to the Luskers' indemnification and warranty obligations provided in Sections 11 and 13 hereof, which obligations shall survive the completion of such AERs) pertaining thereto satisfied upon the day [hereinafter the "AERs Completion Date"] that architect Turner (with Mr. Knafos concurrence) formally certifies to the NYC Building Department that the AERs are completed and ready for NYC Building Department inspection, provided that such certification shall be made only after Mr. Knafo has agreed that the AERs have been completed in conformity with the applicable requirements of the NYC Building Code, and, provided further that Luskers shall be exclusively responsible for completion of and payment for additional (punch list) work (if any) on the structural features of the westerly extension of the Building required to complete the AERs to the reasonable professional requirements of Mr. Knafo and the pertinent NYC Department of Buildings Inspector. The parties further acknowledge and agree that neither they, Mr. Turner nor Mr. Knafo can control or materially influence (other than by making repeated written requests for inspection) the timing of NYC Building Department inspections.
**(continued)**

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 8 of 12

13. Warranty of Skylight Repairs: The Luskers shall warrantee the sound and watertight condition of the skylight to 85 MSAI for a period of five (5) years from and after the AERs Completion Date (hereinafter the "Warranty Period"); during such Warranty Period the Luskers shall be exclusively responsible for making and paying for any further repairs needed to maintain the skylight in sound, leak-free condition. The Luskers warranty obligation hereunder shall not extend to or encompass (i) events constituting an Act of God inflicting damage on the Building as a whole nor shall such obligations absolve or be construed to absolve (ii) either upper floor tenants or third parties (including, without limitation, contractors working on the Building or its roof) from responsibility and liability for damage(s), if any, to the skylight or any component thereof resulting from the negligent conduct of such parties. The parties agree that the Luskers shall have the burden of proving to 85 MSAI that any damage to the skylight has resulted from (i) or (ii) above, and in the absence of such proof, the Lusker's shall be solely responsible for promptly repairing the skylight to a sound and watertight condition. In the event that the Luskers transfer the Common Shares pertaining to their first floor residential loft space to any third party prior to the end of the Warranty Period, they shall require the transferee of said shares to assume the foregoing warranty obligations.

14. Payment in Settlement of Disputes: In full and complete settlement of all outstanding disputes and claims through and including the date of the execution of this Agreement, the parties agree that:

(A)(1) upon execution and delivery of this Comprehensive Settlement Agreement, the Luskers shall pay to 85 MSAI and 85 MSAI shall accept payment of the sum of Twenty-Nine Thousand Six Hundred Twenty-Eight ($29,628.00) Dollars,

(A)(2) upon receipt of such payment, 85 MSAI shall cause its books of account and any / all records maintained by Andrews Building Corporation to be adjusted to reflect payment in full of all maintenance arrears and a "0" balance in the Luskers maintenance contribution account as of June 30, 2000, and

(B) the Luskers shall be solely and exclusively responsible for payment in full of all costs and expenses they may incur pursuant to Section 4 hereof, in making the AERs and performance of their warranty obligations under Section 13 hereof.

15. Luskers Future Contributions to the Buildings Operating and Maintenance Expenses: (A) 85 MSAI and the Luskers agree that --separate and apart from and in addition to the payments provided in Section 14 hereof

**(continued)**

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 9 of 12

the Luskers shall from and after the first day of July, 2000 contribute to the Buildings operating and maintenance expenses in respect of all the first floor and cellar space comprising their loft (including the North Gallery) a monthly sum equal to 1/12th of [15% + 5.33%=] 20.33% of the monthly contributions to the Buildings operations and maintenance expenses from all 85 MSAIs shareholders.

(B) 85 MSAI agrees that no increase(s) in annual maintenance charges or monthly maintenance payments shall be or become due and payable without prior discussion among and approval by a majority of 85 MSAIs Board of Directors at meetings scheduled by written notice (including a proposed agenda identifying a maintenance increase as an issue to be discussed for each such meeting) which shall be held in the Building on Tuesdays or Wednesdays in the evening.

(C) on the same basis copies of and access to such documents are afforded all 85 MSAI shareholders, 85 MSAI shall supply to the Luskers full and complete copies of all 85 MSAIs annual federal tax returns, any and all financial statements prepared by 85 MSAIs outside accountant(s) and all reports, summaries and analyses of the Buildings actual and projected operating expenses and proposed expenditures for renovations and repairs (including legalization repairs and expenditures) for the year 2000 and future calendar years prepared by Andrews Building Corporation and/or 85 MSAIs officers or directors.

16. Proprietary Lease. Simultaneous with the execution and delivery of this agreement, the Luskers shall execute a proprietary lease substantially consistent with the terms and conditions of this Comprehensive Settlement Agreement.

17. Enchanted Forest Sub-tenancy; Dismissal of All Pending Actions and Appeals: 85 MSAI acknowledges and agrees that The Enchanted Forest Gallery, David Wallace as its proprietor and their successors-in-interest occupy the North Gallery as the Luskers sub-tenants and, consequently, have no direct obligation to 85 MSAI. Consequently, 85 MSAI agrees that the claims asserted on its behalf in LL/T proceeding 063736 / 97 against Mr. Wallace and the Enchanted Forest Gallery shall be dismissed with prejudice. The parties further respectively agree to promptly instruct their respective counsel to cooperate in the dismissal with prejudice of their claims solely against the other in the following actions, proceedings and related appeals:

(continued)

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 10 of 12

LL/T Action Nos. 063735, 063736 / 97 and 052 868 / 98

New York County Supreme Court Action 600 926 / 97

and to advise the NYC Loft Board of the comprehensive settlement effected hereby with a request that the pending Loft Board Enforcement Action against 85 MSAI with respect to the repair of the skylight be dismissed with prejudice.

18. Indemnification: The Luskers agree to indemnify 85 MSAI, its shareholders, tenants, sub-tenants, invitees, directors and officers (hereinafter together referred to as "Indemnified Party") against all existing claims and all future claims arising from any use of the North Gallery by the Luskers, their subtenants or sublicensees, or any other person or entity. For purposes of this indemnification, the definition of the North Gallery includes the building area outside the North Gallery. This indemnification specifically includes, but is not limited to, any tort claims brought by a person or other entity injured or allegedly injured on or in the North Gallery. Indemnification shall include reimbursing the indemnified party for the payment of any judgments, interest, penalties or fines levied, as well as any attorneys' fees, and expenses including the expense of any expert witnesses or other persons reasonably necessary to assist the indemnified party in defending against such claim(s).

19. Mechanics of Indemnification: Promptly after receipt by an Indemnified party of notice of commencement of any proceeding against it, such indemnified party will, if a claim for indemnification is to be made against the Luskers under paragraph 18 above, give notice to the Luskers of the commencement of such proceeding, but the failure to notify the Luskers will not relieve the Luskers of any liability that they may have to any indemnified party, except to the extent that the Luskers demonstrate that the defense of such action is prejudiced by the indemnified party's failure to give such notice. If any proceeding referred to in this section is brought against an indemnified party and the indemnified party gives notice to the Luskers of the commencement of such proceeding, the Luskers will be entitled to participate in such proceeding and, to the extent that they wish (unless (i) the Luskers are also a party to such proceeding and the indemnified party determines in good faith that joint representation would be inappropriate) to assume the defense of such proceeding with counsel satisfactory to the indemnified party and, after notice from the Luskers to the indemnified party of its election to assume the defense of such proceeding, the Luskers will not, as long as it diligently conducts such defense, be liable to the indemnified party under this article for any fees of other counsel or any other expenses with respect to the defense of such proceeding subsequently incurred by the

(continued)

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 11 of 12

indemnified party in connection with the defense of such proceeding. If the Luskers assume the defense of a proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be effected by the Luskers without the indemnified party's approval unless the sole relief provided is monetary damages that are paid in full by the Luskers; and (iii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its approval. If notice is given to the Luskers of the commencement of any proceeding and the Luskers do not, within ten days after the indemnified party's notice is given, give notice to the indemnified party of their election to assume the defense of such proceeding, the Luskers will be bound by any determination made in such proceeding or any compromise or settlement effected by the indemnified party.

20. Exchange of General Releases: Upon execution and delivery of this Agreement, the parties shall exchange general releases of all claims against the other party through and including the date of the signature of and delivery of such releases excluding only claims arising from either party's failure the abide by and perform its respective obligations under this Comprehensive Settlement Agreement.

21. Certificate of Occupancy: 85 MSAI represents that 85 MSAI (with respect to the common areas of the Building) and all its shareholders / occupants of the Building (with respect to their respective lofts) have undertaken and agreed to make every effort to complete by December 31, ____, 2000 (or as soon thereafter as reasonably practicable) the repairs and modifications necessary to qualify the Building for the Certificate of Occupancy. The Luskers acknowledge such undertaking and agreement and, consistent with the completion of this Agreement, agree to make corresponding efforts with respect to the portions of the Building which they (the Luskers) own or occupy.

22. Potential Conflicts with Proprietary Lease: In the event the terms and conditions of this Agreement conflict in any way with the terms and conditions of the proprietary lease, the proprietary lease (and the documents referred to therein) shall control. In all matters in which this Agreement is silent or about which the terms and conditions of the proprietary lease and this Agreement both pertain to the same issue, the proprietary lease (and the documents referred to therein) shall control.

23. Resolution of Future Disputes: The parties acknowledge and agree that the litigation between them since February, 1997 has proven both unduly costly, burdensome and a markedly inefficient way to address their

**(continued)**

COMPREHENSIVE SETTLEMENT AGREEMENT
PAGE 12 of 12

differences. The parties further agree that hereafter (a) they will each use their best efforts to address and resolve any differences which may arise between them on the basis of good faith discussion(s) and principled, reasoned compromise, such discussion(s) and compromise to specifically include consideration of any disputed matters at meetings of 85 MSAIs (or any successor-in-interests) Board of Directors attended by all pertinent parties, and (b) that any dispute (other than a claim for possession by 85 MSAI for Lusker's nonpayment of maintenance) which cannot be so resolved shall be submitted to binding arbitration conducted pursuant to the American Arbitration Associations ("AAA") New York City office rules and regulations governing three arbitrator panels. It is expressly agreed that judgement may be entered in any court of competent jurisdiction upon any decision or award rendered by an AAA-NYC office three arbitrator panel.

24. Binding Contract: The parties agree to execute two (2) original copies of this Comprehensive Settlement Agreement and to provide one (1) fully executed original to the other party. The parties further acknowledge and agree that this agreement shall be and be deemed to be a legally binding contract between the parties subject to enforcement (by specific performance or otherwise) in any court having jurisdiction of claims arising hereunder. The signatories on behalf of 85 MSAI represent and warrant to the Luskers that they have been and are fully authorized to execute and implement this agreement for and on behalf of 85 MSAI.

Dated: New York, New York

July 13ᵗʰ, 2000


85-87 MERCER STREET ASSOCIATES, INC.


by _____          _____

David Yamner, President                 John Lombardi, Vice-President


by _____          _____
RONALD LUSKER                           MARILYN KOCHER LUSKER

## Façade and Air Conditioning Agreement

Whereas, Ronald Lusker and Marilyn Kocher Lusker ("Lusker") are the owners of the fifteen shares and the proprietary lease allocated to Apt. 1R (including North Gallery–Retail Store and westerly 2/3 of Cellar) at 85 Mercer Street, New York, New York;

Whereas, 85-87 Mercer Street Associates, Inc. (the "Co-op") desires to make certain changes to the ground floor level façade of the building at 85 Mercer Street, New York, New York (the "Building");

Whereas, both Lusker and the Co-op are desirous of amicably having such façade changes made;

Wherefore, in consideration of the mutual promises and undertakings herein set forth, it is hereby agreed as follows:

1. Lusker shall, at Lusker's cost and expense, remove his air conditioning unit from above the doorway in bay 7 (see attached Diagram #1);

2. Lusker shall permit the Co-op to create a clearance for the new tall lobby doors, by allowing the Co-op to create an 8-inch to 12-inch clearance above the existing Co-op lobby allowing the Co-op to raise this small section of the lobby ceiling to the base of the existing transom window (which window borders Lusker's Apt. 1R–Retail Store) at the top of the new lobby doors (per diagram #2 – Interior View). Such work to be done at the Co-op's sole cost and expense.

3. The Co-op shall provide to Lusker up to a $4,000.00 allowance for a new air conditioning system for him and a space in bay 8 to accommodate the compressor

to such system, which shall be located above the original service entrance in bay 8, behind a new louver (choice of louver to be made by Co-op) replacing the existing multipaned transom window pending approval by The Landmarks Preservation Commission per diagram #3. Should such louver not be approved by The Landmarks Preservation Commission, Co-op retains the right to reconfigure or reposition the compressor in the same service entrance space and vent through a louver above the existing transom at the top of the bay, per diagram #4, which has been approved by The Landmarks Preservation Commission. Lusker shall have the right to use this space after installation for continued use and maintenance of the system, but only such system and nothing else, including the right to service, repair and replace it. Lusker shall not be required to pay any fee to the Co-op for this right to maintain and use such air conditioning system.

4. The air handler to Lusker's new air conditioning system shall be installed per Lusker's direction, in the interior of Lusker's Apt. 1R -- Retail Store.

5. The drainage of the compressor shall be according to the Co-op's specifications;

6. The contractor who will prepare bay 8 for the new air conditioning installation (i.e., such as creating a bed for the air conditioning unit), is to be chosen by the Co-op. The cost of this preparation shall be borne by the Co-op. The air conditioning contractor has been chosen by Lusker and has been approved by the Co-op. The Co-op shall make payments for the air conditioning system to the amount of the aforementioned $4,000.00 credit directly to the air conditioning contractor, pursuant to appropriate invoices.

2

7.      The Co-op retains the right to replace the existing support system of the compressor. The compressor is currently hung on support brackets from the roof of the service entrance housing. The Co-op may (at its sole cost) replace the entire service entry shack in bay 8, which means that the Co-op will either need to install a shelf/bed on which the compressor will rest or install a new set of suspension brackets from the new roof of the service shack.

8.      The Co-op, at its sole cost and expense, shall paint the entire ground floor façade, including all doors (old and new), per requirement of The Landmarks Preservation Commission. The painting shall be a uniform color. This process may require the making of changes to the base of some of the old doors to restore historic condition, if required by The Landmarks Preservation Commission.

9.      Once the new air conditioning system for Lusker is installed and operating, Lusker shall be responsible for its operation, repair and maintenance at his sole cost and expense. He shall also be responsible for any damages caused to the Co-op as a result of this operation, maintenance and repair.

Dated:    9/3     , 2006

85-87 Mercer Street Associates, Inc.

By: _____
       Johannes Girardon, Pres.

_____
Ronald Lusker

_____
Marilyn Kocher Lusker

3



Diagram #1

Diagram #2

AA

85-87 Mercer Street Associates

Interior View - North Store - with Elevator Lobby & Raised Ceiling to Allow for Clearance
of new Lobby Doors in Bay 7.



**EXHIBIT "C"**

### Sale: Lusker to Stokes

Subject to the conditions set forth below, The Board of Directors of 85-87 Mercer Street Associates, Inc. (The "Board") approves Christian Stokes as the Purchaser of the 15 Shares of 85-87 Mercer Street Associates, Inc. allocated to Unit 1R (including North Gallery-Retail Store) at 85-87 Mercer Street (the "Unit"), pursuant to a contract of sale from Ronald Lusker and Marilyn Kocher Lusker, dated March 30, 2007, to wit:

1. Any change in the use and/or occupancy of the Unit or any part thereof, from the manner and configuration in which it is currently being used and/or occupied as of July 27, 2007, must be approved in writing by the Board, in advance of any such change;

2. Any tenant or sub-tenant of the Unit or part thereof subsequent to Purchaser's purchase of the Unit must be approved in writing by the Board, prior to the execution of a lease, sub-lease or occupancy agreement relating to any portion or all of the Unit;

3. Since the Board is in the final stages of obtaining a permanent certificate of occupancy for the Building at 85-87 Mercer Street, New York, New York ("C of O"), the Board will not approve any changes in the use or occupancy of all or a portion of the Unit, if such changes could potentially have the effect of delaying the current anticipated timetable for the Board's obtaining of such C of O;

Dated: As of July 27, 2007

The Board of Directors

Of 85-87 Mercer Street

Associates, Inc.

By _____

Johannes Girardoni, President

**EXHIBIT "D"**

## EBERT & ASSOCIATES, LLC
### ATTORNEYS AT LAW
350 FIFTH AVENUE, SUITE 4011
NEW YORK, NEW YORK 10118
TELEPHONE (212) 290-4000
FACSIMILE (212) 290-1717
www.ejlaw.net

August 1, 2007
VIA HAND-DELIVERY AND
FACSIMILE 212-973-9101

Mr. Paul F. Peragine, Esq.
757 Third Avenue, 19th Floor
New York, NY 10017

Re: The Purchase of Unit IR at 85 Mercer Street, New York, NY by Stokes from Lusker

Dear Mr. Peragine:

Yesterday we received from Andrews Building Corp., via facsimile, the approval letter dated July 27, 2007 by the co-op corporation. Unfortunately there is a serious problem with the approval letter. The approval letter sets for three additional conditions on the purchaser.

Pursuant to section 6.1 of the contract of sale for the above referenced contract of sale, the above referenced transaction is subject to the unconditional consent of the Corporation.

At this time, the Purchaser cannot accept the conditions dictated by the co-op corporation has elected to cancel the contract of sale under section 6.3 and instructs the Seller to promptly refund the Contract Deposit of $250,000.00. Upon the proper negotiation of the Contract Deposit refund check, the contract of sale shall be deemed fully cancelled with neither party having any further obligations to the other.

If you have any questions concerning the foregoing, please contact me. Thank you.

Sincerely,

Steven Ebert

cc: Christian Stokes

**EXHIBIT "E"**

85–87 Mercer Street Associates, Inc.
c/o Andrews Building Management Corporation
666 Broadway, 12th Floor
New York, NY 10012

Date:   August 1, 20007
From:   The Board of Directors
To:  Mr. Paul Peragine

Dear Mr. Peragine,

Regarding your letter dated, August 1, (Re: Lusker to Stokes), it is the Board's view that
(i) and (ii) are covered under the Co-op's Proprietary Lease, and that (iii) is provided
solely for informational purposes.

Sincerely,
Board of Directors

EXHIBIT "F"

07. 11. 00  15:59 FAX 212 797 3369          B. K. H. B.                              ℃ 02/027

PROPRIETARY LEASE

Apt. No.: _1R_ (incl. North Gallery and
Westerly 3/3 of Cellar)

Common Shares: _15_

85-87 MERCER STREET ASSOCIATES, INC.,

Lessor.

TO

RONALD LUSKER AND MARILYN KOCHER LUSKER

Lessee,

PROPRIETARY LEASE

Baden Kramer Huffman & Brodsky, P.C.
20 Broad Street
New York, New York 10005

07 11 00  TUE 16:01  [TX RX No 84581] ☑002

## PAYMENT OF RENT:

12.     The Lessee will pay the rent to the Lessor upon the terms and at the times herein provided, without any deduction on account of any set-off or claim which the Lessee may have against the Lessor, and if the Lessee shall fail to pay any installment of rent promptly, the Lessee shall pay interest thereon at the maximum legal rate from the date when such installment shall have become due to the date of the payment thereof, and/or other charges as may be determined by the Board of Directors, and such interest or charges shall be deemed additional rent hereunder.

## HOUSE RULES:

13.     The Lessor has adopted House Rules which are appended hereto, and the Board of Directors may alter, amend or repeal such House Rules and adopt new House Rules. This Lease shall in all respects be subject to such House Rules which, when a copy thereof has been furnished to the Lessee, shall be taken to be part hereof, and the Lessee hereby covenants to comply with all such House Rules and see that they are faithfully observed by the family, guests, employees and subtenants of the Lessee. Breach of a House Rule shall be a default under this Lease. The Lessor shall not be responsible to the Lessee for the nonobservance or violation of House Rules by any other lessee or person.

## USE OF PREMISES:

14.     (a)     All Apartment Units in the Building shall be covered by this form of lease and are to be occupied for the uses set forth in paragraph 14(c).

(b)     The Lessee shall not, without the written consent of the Lessor on such conditions as Lessor may prescribe, occupy or use the Apartment Unit or permit the same or any part thereof to be occupied or used for any purpose other than as a artist studio and appurtenant residential use by the Lessee, Lessee's spouse and their children, and such other persons as are approved by the Board. In addition to the foregoing, the Apartment Unit may be occupied from time to time by guests of the Lessee for a period of time not exceeding two weeks, unless a longer period is approved in writing by the Lessor, but no guests may occupy the Apartment Unit unless one or more of the permitted adult residents are then in occupancy or unless consented to in writing by the Lessor.

(c)     Under current zoning laws, the Apartment Unit (excluding the North Gallery which is a NYC Zoning Resolution-compliant retail gallery) may be used residentially only as joint living-work quarters for artists, and each unit must be occupied by an person certified as an artist by the New York City Department of Cultural Affairs or by a residential tenant determined by the New York City Loft Board to have occupied such unit as a "grandfathered tenant". Notwithstanding any other provision in the proprietary lease to the contrary, so long as the said zoning laws remain in effect, the shares allocated to these units and the proprietary lease appurtenant thereto may be transferred only to certified artists or to transferees who demonstrate, to the Lessor's satisfaction, that they will comply with the zoning restrictions limiting occupancy of the unit to certified artists or "grandfathered tenants". If the laws and regulations requiring restricting residential use only by certified artists are revoked, limited, or otherwise changed, this paragraph (c) shall be automatically deemed to be broadened to permit any residential use then permitted. Notwithstanding the foregoing, the Lessee may use the Apartment Unit for other purposes provided that (i) the Lessee is solely responsible for all the costs and expenses in converting the Apartment Unit's use under

- 7 -

the then applicable zoning and other laws or regulations which may pertain to the Apartment Unit; (ii) that the converted use is legal and permissible under such laws or regulations and (iii) does not violate such guidelines as may be imposed by the Board

SUBLETTING:

15.    There shall be no subletting in whole or in part of any apartment in the Building without the consent granted by a majority of the Directors or, if consent is not granted by the Board of Directors, by lessees owning at least 66-2/3% of the then issued shares of the Lessor, *excluding, however*, the North Gallery portion of Lessee's unit which may be sublet by Lessee consistent with the provisions of Section 5 of the CSA without Lessor's prior consent. Lessor"s consent to subletting may be withheld for any reason whatsoever, and may be subject to any conditions that the Directors or lessees (as the case may be), may, in their discretion, impose, including but not limited to requiring security deposits, and subletting fees. Prior to granting consent, the Board may require the submission of such documents regarding the proposed sublessee and the terms of the subletting as it deems necessary. The Board of Directors shall establish as part of the House Rules a procedure for seeking approval for subletting. In connection therewith, the Board may establish schedules for security deposits, subletting fees and application fees to be paid to the Lessor by the subletting Lessee. All costs for obtaining consent for subletting shall be paid by the Lessee desiring to sublet, whether or not consent is granted, and shall constitute additional rent under the proprietary lease.

ASSIGNMENT:

16.    (a)    The Lessee shall not assign this Lease or transfer the shares to which it is appurtenant or any interest therein, and no such assignment or transfer shall take effect as against the Lessor for any purpose, until:

(i)    An instrument of assignment in form approved by Lessor executed and acknowledged by the assignor shall be delivered to the Lessor; and

(ii)    An agreement executed and acknowledged by the assignee in form approved by Lessor assuming and agreeing to be bound by all the covenants and conditions of this Lease to be performed and complied with by the Lessee on and after the effective date of said assignment shall have been delivered to the Lessor, or, at the request of the Lessor, the assignee shall have surrendered the assigned lease and entered into a new lease in the same form for the remainder of the term, in which case the Lessee's lease shall be deemed canceled as of the effective date of said assignment; and

(iii)    All shares of the Lessor to which this Lease is appurtenant shall have been transferred to the assignee, with proper transfer taxes paid and stamps affixed, *provided* that Lessee shall have the right to assign (A) the five (5) common shares allocated to the North Gallery and (B) the ten (10) common shares together with the related CORs in separate, independent transactions to two different assignee(s); and

(iv)    All sums due from the Lessee shall have been paid to the Lessor,

- 8 -