Joseph H. Neiman, Esq.
179-36 80th Road
Jamaica Estate, NY 11432
Tel: (201) 487-0061
*Attorney for Plaintiff, Christian Stokes*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| CHRISTIAN STOKES | 08 CIV 3667 |
| Plaintiff, | (CM)(DFE) |
| vs. | |
| RONALD LUSKER, MARILYN LUSKER, EBERT & ASSOCIATES, STEVEN EBERT, ESQ., ANDREWS BUILDING CORP., MALLEY GROUP, ERIC MALLEY, and 85-87 MERCER STREET ASSOCIATES, INC., | **AFFIRMATION OF CHRISTIAN STOKES** |
| Defendants. | |

_____

Christian Stokes, hereby affirms the following under penalty of perjury:

1. I am Christian Stokes, plaintiff in the above-referenced matter.

2. I am a citizen of Ireland. I have been a citizen of Ireland since my birth and reside in Ireland. Although I do own property in other countries, my principal place of residence is Irland and I am not a citizen of the United States.

3. Prior to my entering into the negotiations regarding the purchase of the premises known as 85-87 Mercer Street, 15 shares, Eric Malley and Malley Group were retained by me as my real-estate broker in selling my apartment. Throughout the subject ordeal, they remained my broker. (See Exhibit A)

4.      I also had a verbal agreement with Eric Malley that he would be the broker to rent out the premises that I was seeking to purchase (85-87 Mercer Street) and this was for commercial tenants. He assured me that getting a commercial tenant at the rent I needed to make the deal work would be easy.

5.      I had several meetings with the Luskers, the sellers of the premises, who in fact told me that the premises would "make an ideal flagship store" which was my intention and is what Eric Malley told me could be done with the premises.

6.      Prior to the signing of the contract, Ronald Lusker, Marilyn Lusker, Steven Ebert, Eric Malley and myself all met at Mr. Paul Peragine's office in Manhattan, who I was advised was the attorney for the Luskers[1]. During the meeting, it was sated clearly that the premises were to be used as a rental for a retailer. This was at least the third time the Luskers represented to me that the premises could be used for said purpose despite what they knew and yes what was in the co-op documents. Nonetheless, they went along with their scheme to dupe me out of a $250,000.00 deposit.

7.      Annexed hereto as Exhibit B is an application which I should have been given at or prior to the signing of the contract. This application was not forwarded to me until several days after the signing of the contract at which time it was brought to my attention that in fact, as set forth in the application, the premises could not be rented to commercial tenants.

8.      As a result, I refused to sign that portion of the application. Nonetheless, the co-op board still approved my application.[2] This is mind boggling. Clearly, a required document by the co-op board that is refused to be signed by the individual

---

[1] I was also advised that he, on a number of occasions, was Eric Malley and Malley's attorney.

[2] On my application, I indicated I was going to use the premises for commercial purposes.

2

whose signature is necessary should have led to me not being approved. As is alleged in my complaint, my approval by the co-op board in the wake of me not signing the subject document and my finances makes my approval highly suspect. It is believed that the Board and the Luskers and possibly Eric Malley were all in the scheme.

9. I never received the proprietary lease or any such documents and assumed that my attorney had and reviewed same.

10. Annexed hereto as Exhibit C is a copy of the retainer agreement that defendant Ebert had me sign regarding the return of my deposit money. It is odd that Ebert now claims that I should not be entitled to any deposit money simply because I signed the contract when in fact he was willing to represent me and take money from me to do same. What he did not tell me when he entered into Exhibit C was that perhaps he should not be the attorney in that matter since (a) he might be a witness and (b) I might have a claim against him.

11. As to the documents referenced in the contract, the proprietary lease and all of the other co-op documents, I never received them. Mr. Ebert was the only one that had them and Mr. Ebert knew I had never seen them and I relied upon Mr. Ebert reading them and advising me if there was anything in those documents that I needed to be aware of. He also knew from the inception of this deal that it was my intention to purchase the premises and rent it out to a commercial retailer. He knew this both from my discussions with him and at the meeting he attended along with Ronald Lusker, Marilyn Lusker, Eric Malley and myself and Mr. Paul Peragine.

12. Essentially, Mr. Ebert was negligent in not only advising me not to sign this contract, he was negligent in not giving me all of the co-op documents which

obviously were forwarded to him. He was negligent in not inquiring as to whether or not I read the proprietary lease or any other co-op documents referenced in the contract. He was negligent in not telling me what was in those documents that he should have read. He either was negligent in not telling me what was in those documents or in fact did not read the documents himself and was not aware what was in there. Either way, to claim that my lack of diligence is a defense for his negligence is preposterous. He knew I did not have any of those co-op documents because they were not given to me. At a minimum, he should have enquired of me whether or not I had seen those documents.

_____
CHRISTIAN STOKES

Affirmed this 21st day of July, 2008

Affidavit/Stokes

# EXHIBIT A



residential real estate services

# EXCLUSIVE RIGHT TO SELL
# PROPERTY LISTING AGREEMENT

Mr. Christian Stokes
255 Hudson Street, Apt. 4A
New York, NY 10013

RE: 255 Hudson Street, Apt. 4A

Dear Christian,

Thank you for choosing the MalleyGroup to Market your Property. We are ready to launch the marketing effort that we have reviewed together to bring about as many well-qualified buyers at the best possible price.

This letter shall confirm our agreement that you have engaged the MalleyGroup to act as your agent with the exclusive right to sell your Property at 255 Hudson Street, Apartment 4A, New York, NY 10013. We shall offer the said property for sale at $2,525,000.00 Maintenance charges of $1,684.00/month and Real Estate Taxes of $117.00/month. You further represent that you are the owner of the property.

We hereby agree to use our reasonable efforts to bring about the sale of your property and you hereby agree to employ us exclusively as agents for the sale of said property. This exclusive right to sell agreement means that if the property is sold during the listing term, you will owe us the commission regardless of who procures the buyer. The asking price at which we may offer the property is listed above and on such other terms as you may advise us.

It is understood and agreed that you will pay the MalleyGroup, a commission of six percent (6%) of the contract sales price, notwithstanding that it may be different from the asking price or from the sale price. When earned, this commission will be payable at closing. However, we shall not be entitled to any commission and you shall not be liable to us in any way, if the closing of title shall fail to take place for any reason whatsoever, except for your willful default under the "contract of sale" after the contract is countersigned.

However, should a contract of sale be entered into, and the agreed upon deposit be issued and the contracted buyer withdraw from the offer and forfeit the deposit, it is understood that you will promptly pay the MalleyGroup 15% of the said deposit. For example, $150,000 deposit, 15% = $22,500 upon such occurrence. The MalleyGroup will then continue with its reasonable efforts to bring about another buyer to purchase the said property as exclusive agents for the sale of the property at the said and agreed upon commission rate listed above for a sale.

As exclusive agent, the MalleyGroup and or one if its agents may be the interested party and may offer to buy the property. Should an offer be accepted by you and a closing occur, under these circumstances, the MalleyGroup and or its agents are free to utilize the said property in any manner they deem appropriate including: remodeling, renting, or selling the property for their benefit.

**malley**group™
residential real estate services

page 2

It is our further understanding that this agreement will begin the date you execute it and will continue in full force until the property has sold and closed.

It is understood that during the term of this agreement you will refer to us all inquiries you may receive from brokers, or from individuals regarding the sale of your apartment.

This agreement constitutes the entire agreement between us and cannot be changed, rescinded or modified except in writing, signed by both of us. The agreement shall bind and benefit each of our respective successors and us. Neither party may assign this agreement.

Thank you for retaining the MalleyGroup. We appreciate this opportunity and will do our best to bring about a satisfactory transaction.

Sincerely,

Eric Malley
**MalleyGroup**

**Agreed and accepted:**

By:  Christian Stokes

Cell Phone#: 646 821 1672

Date: 13th March 2007

95 Morton Street  New York, NY 10014   t 212.727.7007  f 212.658.9230   info@malleygroup.com   www.malley      .com

# EXHIBIT B

Case 1:08-cv-03667-CM     Document 26-3     Filed 07/21/2008     Page 1 of 4

PURCHASER'S AGREEMENT

____CHRISTIAN STOKES____ ("Purchaser"), has entered into a contract of sale for the purchase of _____ shares of stock of 85-87 Mercer Street Associates, Inc. (the "Co-op"), such shares representing Purchasers' interest in Apartment No. _____ (the "Unit") in the cooperative apartment building located at 85-87 Mercer Street, New York, New York (the "Building") and has represented that the Unit will be occupied by Purchaser.

Purchaser hereby agrees as follows:

1. Purchaser has read and is familiar with the terms of the Building's by-laws, proprietary lease, house rules and regulations and all restrictions and limitations contained therein.

2. Purchaser agrees to be fully responsible for compliance with and to be bound by the requirements set forth in the documents identified above, including without limitation, restrictions on the use of the Unit, and Purchaser acknowledges that failure to so comply constitutes a default under the proprietary lease. Purchasers agree to pay those costs, penalties or expenses, whether they are imposed on Purchaser or on the Co-op, its Board of Directors and/or officers that arise directly from Purchaser failure to so comply.

3. Purchaser understands that the provisions of the New York City Zoning Resolution applicable to the building requires that the Unit be occupied as "Joint Living-Work Quarters for Artist" and that this requires that at least one occupant of the apartment must be an artist certified as such by the New York City Department Cultural Affairs. If no certified artist is in residence, the occupancy is not legal.

4. Purchaser agrees (i) to be responsible for producing, upon demand of any authorized municipal authority, an artist's certification from the New York City Department of Cultural Affairs

for at least one occupant of the Unit; and (ii) to indemnify the Co-op, it Board of Directors and/or officers against any and all losses, costs, liabilities and expenses incurred, including reasonable legal fees, fines and penalties, that arise from Purchasers' failure to produce such certification or otherwise comply with the requirements of New York City Zoning Resolution with respect to artists-in-residence or any other statute, rule, regulation or ordinance in connection therewith (collectively "AIR Laws").

5. Purchaser agrees that in the event a violation of the AIR Laws is issued by the New York City Department of Buildings or any other governmental agency against the Co-op, its Board of Directors and/or officers, it agrees to appear and defend any legal proceeding commenced by reason of its failure to obtain such certification, or otherwise comply with the AIR Laws, at Purchaser's own cost and expense. Purchaser further agrees to pay any fines levied by any governmental agency or court of competent jurisdiction in connection therewith, and agrees to abide by the order of such court, subject to its right to appeal any adverse decision rendered by such court.

6. Purchaser further agrees that in the event that they are unable within fifteen (15) days to (i) produce such artist's certification, or (ii) otherwise comply with the requirements of the AIR Laws and/or the requirements to enable the Co-op to procure or maintain a Certificate of Occupancy for residential use for the unit, Purchaser's shall forthwith take such actions as may be required in the sole discretion of the Co-op including, without limitation, promptly vacating the unit and immediately offering the shares in the co-op for sale.

7. Notwithstanding anything in this Agreement to the contrary, the Co-op agrees that it will not selectively enforce the provisions in the proprietary lease and/or this Agreement pertaining to the AIR Laws against the Purchaser.

Agreed to this _____ day of _____, 199___.

_____
Purchaser's Signature

Consented and agreed to:

85-87 Mercer Street Associates, Inc.

By: _____

EXHIBIT C

**EBERT & ASSOCIATES, LLC**
350 Fifth Avenue, Suite 4011
New York, NY 10118
Telephone: (212) 290-4000
Facsimile: (212) 290-1717

September 8, 2007
VIA EMAIL

Mr. Christian Stokes
11 Marino Park
Mount Merrion Avenue
Blackrock, Dublin
IRELAND

Re: Contract Deposit Litigation for Potential Purchase of 85-87 Mercer Street, New York, NY

Dear Mr. Stokes:

Thank you for retaining Ebert & Associates, LLC ("E&A") to represent you. This retainer letter will confirm our mutual obligations concerning this representation.

E&A agrees to represent you as special counsel in connection with the above referenced litigation and other related matters in the State of New York and such other forums that will be agreed to from time to time.

All parties to this contract agree that there shall be a retainer of $500.00. All parties also understand that all legal fees shall be deducted from the retainer, and that said retainer shall be replenished within fifteen (15) days from the date of the current month's legal bill.

Fees for legal services shall be at the rate of $300 per hour for each hour of service provided by an attorney of the law firm. Expenses are separate, and shall be billed in addition to the hourly rate. We bill our time at the rate of one-tenth (1/10) of an hour. Expenses typically include, postage filing fees, messenger services, transportation fees, international telephone calls, long distance facsimile transmission, duplications and computerized legal research. Please be advised that our billing rate will not change unless we have your prior consent.

E&A bills once per month, which may be modified if agreed to by both parties, and expects that said bill be paid within fifteen (15) days of the statement date. Each bill is itemized for your records. *At the completion of the representation, if you have a positive retainer balance, you will be refunded the difference.*

Should you have any questions, comments or objections about any item contained in the billing statement, please contact us as soon as possible so that we can address your concerns promptly. *You will not be billed for any time spent discussing a billing statement.*

**EBERT & ASSOCIATES, LLC**
Mr. Christian Stokes – Retainer Letter
September 8, 2007
Page 2 of 2

Should the unfortunate event arise whereby you would become unable to pay any bills due and outstanding, please contact us as soon as possible so that we can discuss an alternative payment arrangement.

You have the right to terminate this representation for any reason whatsoever. In the event you decide to terminate the representation, we will present you with a final billing statement. The final billing statement shall represent any final legal fees and expenses incurred from the representation. Payment of this bill will be due within fifteen (15) days as detailed above. Once the final bill has paid by you, E&A will promptly return any funds then remaining in your escrow account.

In the event that a dispute arises between us relating to E&A's fees, you may have the right to arbitration of the dispute pursuant to Part 137 of the Rules of the Chief Administrator of the Courts, a copy of which will be provided to you upon request.

This is to confirm that you have read this letter, agreed to our engagement, and received a copy, which has been fully discussed and explained to your complete satisfaction. Of course, we will always be available to discuss any of the matters set forth in this letter or anything else you may question or be concerned about regarding the subject transaction.

Thank you for considering E&A. We look forward to serving your legal needs on this transaction.

Very truly yours,

Ebert & Associates, LLC

By: *[signature]*

Name: Steven R. Ebert
Title: Member


Received and Agreed to this _____ day of September, 2007.

By: *[signature]*
Mr. Christian Stokes